# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 11, 2020    Decided September 25, 2020

No. 20-5204

CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION, ET
AL.,
APPELLEES

UTE TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION,
APPELLANT

v.

STEVEN T. MNUCHIN, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF U.S. DEPARTMENT OF THE TREASURY, ET AL.,
APPELLEES

———

Consolidated with 20-5205, 20-5209

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:20-cv-01002)
(No. 1:20-cv-01059)
(No. 1:20-cv-01070)

———

*Riyaz Kanji* argued the cause for Confederated Tribes
appellants. With him on the briefs were *Cory Albright*, *Lisa
Koop Gunn*, *Lori Bruner*, *Eric Dahlstrom*, *April E. Olson*,

*Richard W. Hughes*, *Reed C. Bienvenu*, *Bradley G. Bledsoe Downes*, and *Alexander B. Ritchie.*

*Jeffrey S. Rasmussen* argued the cause for appellants Ute Tribe of the Uintah and Ouray Indian Reservation, et al.  With him on the briefs were *Frances C. Bassett*, *Rollie E. Wilson*, *Nicole E. Ducheneaux*, *Natalie A. Landreth*, *Erin Dougherty Lynch*, *Matthew N. Newman*, *Wesley James Furlong*, *Megan R. Condon*, and *Jeremy J. Patterson.*

*Kaighn Smith, Jr.* was on the brief for *amici curiae* National Congress of American Indians, et al. in support of appellants.

*Adam C. Jed*, Attorney, U.S. Department of Justice, argued the cause for appellee.  With him on the brief were *Ethan P. Davis*, Acting Assistant Attorney General, and *Michael S. Raab* and *Daniel Tenny*, Attorneys.

*Paul D. Clement* argued the cause for intervenor-appellees Alaska Native Village Corporation Association, Inc., et al.  With him on the brief were *Erin E. Murphy*, *Ragan Naresh*, and *Matthew D. Rowen*.  *Jonathan W. Katchen* and *Daniel W. Wolff* entered appearances.

*Christine V. Williams* was on the brief for *amici curiae* U.S. Senators Lisa Murkowski, Dan Sullivan, and U.S. Congressman Don Young in support of appellees.

*Allon Kedem*, *Ethan G. Shenkman*, and *Janine M. Lopez* were on the brief for *amicus curiae* Cook Inlet Region, Inc. in support of appellee.

*James H. Lister* was on the brief for *amicus curiae* Alaska Federation of Natives in support of appellees.

Before: HENDERSON, MILLETT, and KATSAS, *Circuit Judges*.

Opinion of the Court filed by *Circuit Judge* KATSAS.

Concurring Opinion filed by *Circuit Judge* HENDERSON.

KATSAS, *Circuit Judge*: Title V of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) makes certain funds available to the recognized governing bodies of any "Indian Tribe" as that term is defined in the Indian Self-Determination and Education Assistance Act (ISDA). Alaska Native Corporations are state-chartered corporations established by Congress to receive land and money provided to Alaska Natives in settlement of aboriginal land claims. We consider whether these corporations qualify as Indian Tribes under the CARES Act and ISDA.

I

A

Since the Alaska Purchase in 1867, the United States has taken shifting positions on the political status of Alaska's indigenous populations. Initially, the government thought that Alaska Natives had no distinct sovereignty. *See*, *e.g.*, *In re Sah Quah*, 31 F. 327, 329 (D. Alaska 1886) ("The United States has at no time recognized any tribal independence or relations among these Indians . . . ."). Over time, it came to view Alaska Natives as "being under the guardianship and protection of the Federal Government, at least to such an extent as to bring them within the spirit, if not within the exact letter, of the laws relative to American Indians." *Leasing of Lands Within Reservations Created for the Benefit of the Natives of Alaska*, 49 Pub. Lands Dec. 592, 595 (1923). Those laws recognize

and implement the unique trust relationship between the federal government and Indian tribes as dependent sovereigns, and the distinct obligations that relationship imposes. *See*, *e.g.*, *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 175–76 (2011). But Alaska Natives differed from other Indians in their "peculiar nontribal organization" in small, isolated villages. Op. Sol. of Interior, M-36975, 1993 WL 13801710, at *18 (Jan. 11, 1993) ("Sansonetti Op.") (quoting H.R. Rep. 74-2244, at 1–5 (1936)).

For over a century, the federal government had no settled policy on recognition of Alaska Native groups as Indian tribes. Instead, it dealt with that question "in a tentative and reactive way," with "decisions on issues concerning the relationship with Natives [being] postponed, rather than addressed." Sansonetti Op. at *2. Because of the "remote location, large size and harsh climate of Alaska," there was no pressing need "to confront questions concerning the relationship between the Native peoples of Alaska and the United States." *Id.* But in 1958, the Alaska Statehood Act provided for a large transfer of land from the federal government to the soon-to-be State. Pub. L. No. 85-508, § 6, 72 Stat. 339, 340–43. And in 1968, oil was discovered on Alaska's North Slope, requiring construction of a pipeline system running across the entire State. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 241–42 & n.2 (1975). These developments forced the federal government to confront at least the question of Native claims to aboriginal lands. *See* Sansonetti Op. at *43.

In 1971, Congress enacted the Alaska Native Claims Settlement Act (ANCSA), a "comprehensive statute designed to settle all land claims by Alaska Natives." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 523 (1998). Rather than set aside land for reservations, as Congress often had done in the lower 48 states, it "adopted an experimental model

initially calculated to speed assimilation of Alaska Natives into corporate America." 1 *Cohen's Handbook of Federal Indian Law* § 4.07(3)(b)(ii)(C) (2019). Among other things, ANCSA "completely extinguished all aboriginal claims to Alaska land" and abolished all but one Native reservation in Alaska. *Native Vill. of Venetie*, 522 U.S. at 524. "In return, Congress authorized the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations that were to be formed pursuant to the statute." *Id.*

As relevant here, ANCSA authorized the creation of two types of corporations to receive this money and land: Alaska Native Regional Corporations and Alaska Native Village Corporations, which we collectively refer to as ANCs. First, the statute divided Alaska into twelve geographic areas, each sharing a common heritage and interests, and it created a regional corporation for each area. 43 U.S.C. § 1606(a). Second, ANCSA required the Alaska Native residents of each "Native village"—defined as any community of at least twenty-five Alaska Natives, *id.* § 1602(c)—to organize as a village corporation to receive benefits under the statute. *Id.* § 1607(a). Village corporations "hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf of a Native village." *Id.* § 1602(j).

Like other corporations, ANCs have boards of directors and shareholders. 43 U.S.C. §§ 1606(f)–(h), 1607(c). The initial ANC shareholders were exclusively Alaska Natives; each Native received one hundred shares of the regional and village corporation operating where he or she lived. *Id.* §§ 1606(g)(1)(A), 1607(c). ANCSA initially prohibited the transfer of stock to non-Natives for twenty years, 43 U.S.C. § 1606(h)(1) (1971), but Congress later made the prohibition continue unless and until an ANC chose to end it, 43 U.S.C.

§ 1629c(a). ANCs may freely sell land to non-Natives and need not use the land "for Indian purposes." *Native Vill. of Venetie*, 522 U.S. at 533. Regional ANCs may provide "health, education, or welfare" benefits to Native shareholders and to shareholders' family members who are Natives or Native descendants, without regard to share ownership. 43 U.S.C. § 1606(r).

B

In 1975, Congress enacted ISDA to "help Indian tribes assume responsibility for aid programs that benefit their members." *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 753 (2016). ISDA authorizes the federal government to contract with Indian tribes to provide various services to tribal members. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012). Under these "self-determination" contracts, the government provides money to an individual tribe, which agrees to use it to provide services to tribal members. *See Menominee Indian Tribe*, 136 S. Ct. at 753.

Specifically, ISDA directs the Secretary of the Interior or the Secretary of Health and Human Services, "upon the request of any Indian tribe," to contract with an appropriate "tribal organization" to provide the requested services. 25 U.S.C. § 5321(a)(1). ISDA defines an "Indian tribe" as

> any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

*Id.* § 5304(e). ISDA further defines a "tribal organization" to include "the recognized governing body of any Indian tribe." *Id.* § 5304(*l*).

C

On March 27, 2020, Congress passed the CARES Act to provide various forms of relief from the ongoing coronavirus pandemic. Title V of the CARES Act appropriated $150 billion "for making payments to States, Tribal governments, and units of local government." 42 U.S.C. § 801(a)(1). These payments cover "necessary expenditures incurred due to the public health emergency." *Id.* § 801(d)(1). Congress directed the payments to be made within 30 days. *Id.* § 801(b)(1).

Of these funds, the CARES Act reserved $8 billion "for making payments to Tribal governments." 42 U.S.C. § 801(a)(2)(B). The CARES Act defines a "Tribal government" as "the recognized governing body of an Indian Tribe." *Id.* § 801(g)(5). It further defines "Indian Tribe" as bearing "the meaning given that term" in ISDA. *Id.* § 801(g)(1).

II

On April 13, 2020, the Department of the Treasury published a form seeking tribal data to help apportion Title V funds. The Department requested each tribe's name, population, land base, employees, and expenditures. The form suggested that ANCs would receive funding. For example, in seeking population information, the form requested the total number of tribal citizens, members, *or shareholders*. On April 22, the Department confirmed its conclusion that ANCs were eligible to receive Title V funds.

8

Between April 17 and 23, three separate groups of Indian tribes filed lawsuits challenging that decision. Collectively, the plaintiffs encompass six federally recognized tribes in Alaska and twelve federally recognized tribes in the lower 48 states. The tribes argued that ANCs are not "Indian Tribes" within the meaning of the CARES Act or ISDA because they do not satisfy the final requirement of the ISDA definition—*i.e.*, because they are not "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 23 U.S.C. § 5304(e). The government agreed that ANCs have not been so recognized, and it further argued that ANCs could not be so recognized. But, the government reasoned, Congress expressly included ANCs within the ISDA definition, and we must give effect to that decision.

The district court consolidated the three cases and granted a preliminary injunction prohibiting the distribution of any Title V funds to ANCs. In finding that the tribes were likely to succeed on the merits, the court reasoned that any "Indian tribe" under ISDA must be "recognized" as such and that Alaska Native corporations, unlike Alaska Native villages, have not been so recognized. As a result of the preliminary injunction, the government has withheld distribution of more than $162 million in Title V funds that it otherwise would have provided to ANCs. Several ANCs and ANC associations then intervened as defendants.

The district court ultimately granted summary judgment to the defendants. After further consideration, the court agreed with the government: ANCs must qualify as Indian tribes to give effect to their express inclusion in the ISDA definition, even though no ANC has been recognized as an Indian tribe.

9

To permit orderly review, the district court granted the tribes' motion for an injunction pending appeal, subject to the tribes seeking expedition in this Court. The injunction prohibited the distribution of Title V funds to ANCs until the earlier of September 15 or a merits decision by this Court. We granted expedition, heard oral argument, and extended the injunction pending our decision.

III

The government first contends that its decision to provide CARES Act funds to ANCs is not judicially reviewable. The Administrative Procedure Act provides a cause of action to persons "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, but withdraws the action to the extent that "statutes preclude judicial review," *id.* § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Any preclusion must be "fairly discernible in the statutory scheme," *id.* at 351, and must appear "with sufficient clarity to overcome the strong presumption in favor of judicial review," *Thryv, Inc. v. Click-to-Call Techs., LP*, 140 S. Ct. 1367, 1373 (2020) (quotation marks omitted).

Nothing in the CARES Act expressly precludes review of spending decisions under Title V. Nonetheless, the government argues that the statute precludes judicial review by implication. It highlights three structural or contextual considerations: the short deadline for disbursing funds, the urgency of providing relief funds quickly, and the lack of any requirement for advance notice of funding decisions.

We are unpersuaded. To begin, the government cites no case in which short statutory deadlines have been held to preclude judicial review by implication. To the contrary, in *Dunlop v. Bachowski*, 421 U.S. 560 (1975), the Supreme Court held that judicial review was available despite a 60-day deadline for the relevant administrative action. *Id.* at 563 n.2, 567. Likewise, in *Texas Municipal Power Agency v. EPA*, 89 F.3d 858 (D.C. Cir. 1996), we rejected a claim that "short statutory deadlines," combined with the need "to compile enormous amounts of data and allocate allowances to 2,200 utilities" within the deadline, made the claim at issue unreviewable. *See id.* at 864–65. The government cites *Morris v. Gressette*, 432 U.S. 491 (1977), where the plaintiffs sought to challenge an administrative failure to object to a state voting measure under section 5 of the Voting Rights Act. But the Act provided other means to obtain judicial review of the underlying legal question, *see id.* at 504–05, and the case involved the same kind of enforcement discretion later held to be generally unreviewable in *Heckler v. Chaney*, 470 U.S. 821 (1985). The government also cites *Dalton v. Specter*, 511 U.S. 462 (1994), but that case turned on the fact that presidential action is not subject to APA review. *See id.* at 471–76. As for urgency, the government frames its argument as only a slight variation on its point about the need for speed.

Finally, while the government may be correct that judicial review would be difficult had it simply disbursed the funds with no prior warning, *see City of Hous. v. HUD*, 24 F.3d 1421, 1424 (D.C. Cir. 1994), that should hardly preclude review where, as here, the government *did* take prior agency action in time to afford review. To be sure, the government might have argued that the actions taken here, including a solicitation of information, were not final agency action reviewable under the APA. We take no position on that question because finality in this context bears on the scope of the plaintiff's cause of action;

it is a forfeitable objection that the government did not press here. *See Marcum v. Salazar*, 694 F.3d 123, 128 (D.C. Cir. 2012).

IV

On the merits, the district court held that ANCs are Indian tribes within the ISDA definition and thus are eligible for funding under Title V of the CARES Act. We review de novo this legal ruling, which was appropriately made on summary judgment. *Stoe v. Barr*, 960 F.3d 627, 629 (D.C. Cir. 2020). In considering the difficult legal question now before us, we have benefitted greatly from the district court's two thoughtful opinions, rendered under severe time constraints, which carefully assess the arguments on both sides.

Title V of the CARES Act makes funding available "to States, Tribal governments, and units of local government." 42 U.S.C. § 801(a)(1). Alaska Native Corporations are neither "States" nor "units of local government" in Alaska. ANCs thus are eligible to receive Title V funds only if they are "Tribal governments." Title V defines a "Tribal government" as "the recognized governing body of an Indian Tribe," *id.* § 801(g)(5), and defines "Indian Tribe" as bearing "the meaning given that term" in ISDA, *id.* § 801(g)(1). So ANCs are eligible for Title V funding only if they qualify as an "Indian tribe" under ISDA. As explained below, ANCs do not satisfy the ISDA definition.

A

ISDA defines an "Indian tribe" as

[1] any Indian tribe, band, nation, or other organized group or community, [2] including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims

> Settlement Act (85 Stat. 688), [3] which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

25 U.S.C. § 5304(e).  The first, listing clause sets forth five kinds of covered Indian entities—any "tribe, band, nation, or other organized group or community."  The second, Alaska clause clarifies that three kinds of Alaskan entities are covered—"any Alaska Native village or regional or village corporation."  The third, recognition clause restricts the definition to a subset of covered entities—those "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."

The text and structure of this definition make clear that the recognition clause, which is adjectival, modifies all of the nouns listed in the clauses that precede it.  Under the series-qualifier canon, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."  A. Scalia & B. Garner, *Reading Law* 147 (2012); *see*, *e.g.*, *Lockhart v. United States*, 136 S. Ct. 958, 963 (2016) (canon applies where "the listed items are simple and parallel without unexpected internal modifiers"); *Jama v. ICE*, 543 U.S. 335, 344 n.4 (2005) (same where "modifying clause" appears "at the end of a single, integrated list").  This canon applies to the listing clause, which ticks off five synonyms in a grammatically simple list (any "tribe, band, nation, or other organized group or community").  Moreover, through its usage of "including," the Alaska clause operates to equate its two parallel nouns ("village" and "corporation") with the five preceding nouns.  And given the obvious similarities between the Indian entities in the listing clause and Alaska Native villages—more than 200 of which have been recognized as

13

tribes—the recognition clause undisputedly modifies "village" as well as the five previously listed Indian groups. Finally, it is not grammatically possible for the recognition clause to modify *all* of the five nouns in the listing clause, *plus* the first noun in the more proximate Alaska clause ("village"), but *not* the one noun in the preceding two clauses that is its most immediate antecedent ("corporation"). If possible, we construe statutory text to make grammatical sense rather than nonsense. *See* Scalia & Garner, *supra*, at 140–43 ("Grammar Canon"). For these reasons, an ANC cannot qualify as an "Indian tribe" under ISDA unless it has been "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."

B

Because no ANC has been federally "recognized" as an Indian tribe, as the recognition clause requires, no ANC satisfies the ISDA definition.

"[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2012)). We adhere to this presumption unless the statute contains some "contrary indication." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991).

In the context of Indian law, "recognition" is a "legal term of art." *Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 613 (9th Cir. 2019). It refers to a "formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal

government." *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C. Cir. 2008) (quotation marks omitted). Federal recognition both establishes the tribe as a "domestic dependent nation" and "requires the Secretary [of the Interior] to provide a panoply of benefits and services to the tribe and its members." *Frank's Landing*, 918 F.3d at 613–14 (quotation marks omitted); *see Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 211 (D.C. Cir. 2013) ("Federal recognition is a prerequisite to the receipt of various services and benefits available only to Indian tribes."); *Miwok Tribe*, 515 F.3d at 1263–64 (noting "the federal benefits that a recognized tribe and its members may claim"); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 57 (2d Cir. 1994) ("After passage of the Indian Reorganization Act recognition proceedings were necessary because the benefits created by it were made available only to descendants of 'recognized' Indian tribes."). Given the well-established meaning of "recognition" in Indian law, and its connection to the provision of benefits to tribal members, we interpret ISDA's requirement that an Indian tribe be "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians" to require federal recognition of the putative tribe.

Several pre-ISDA statutes bolster this conclusion. During the 1950s and 1960s, Congress sought to assimilate Indians by terminating federal recognition of various tribes, thereby ending the special relationship that existed between the federal government and the tribes as sovereigns. *Felter v. Kempthorne*, 473 F.3d 1255, 1258 (D.C. Cir. 2007). By rote formula, these statutes provided that, upon termination, members of the former tribe "shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians." *See, e.g.*, An Act to Provide for the Division of the Tribal Assets of the Catawba Indian Tribe of

South Carolina, Pub. L. No. 86-322, 73 Stat. 592, 593 (1959); An Act to Provide for the Distribution of the Land and Assets of Certain Indian Rancherias and Reservations in California, Pub. L. No. 85-671, 72 Stat. 619, 621 (1958); An Act to Provide for the Termination of Federal Supervision Over the Property of the Ottawa Tribe of Indians in the State of Oklahoma, Ch. 909, 70 Stat. 963, 964 (1956).[1] These statutes confirm that, long before ISDA was enacted, there was an established connection between recognition and sovereignty. Likewise, in text that closely mirrors ISDA's recognition clause, they confirm that with recognition comes various benefits provided "by the United States for Indians because of their status as Indians." In sum, they confirm that not only the general concept of recognition, but also the specific phrase used to describe it in ISDA, are terms of art denoting federal recognition of a sovereign Indian tribe.

The Federally Recognized Indian Tribe List Act of 1994 (List Act) further reinforces this conclusion. It charges the Secretary of the Interior with "keeping a list of all federally recognized tribes." Pub. L. No. 103-454, § 103(6), 108 Stat. 4791, 4792. The list must be "accurate, regularly updated, and regularly published," so that all federal agencies may use it "to determine the eligibility of certain groups to receive services from the United States." *Id.* § 103(7), 108 Stat. at 4792. The list also must "reflect all federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians." *Id.* § 103(8), 108 Stat. at 4792. Repeating this language, the List Act's only substantive section, titled "Publication of list of recognized tribes," requires the Secretary to publish annually a list of "all Indian

---

[1] This precise formulation, or close variants of it, appears in at least sixteen termination statutes enacted between 1954 and 1968.

tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 5131(a). Thus, in language that twice tracks ISDA's recognition clause almost *verbatim*, the List Act equates federal recognition of Indian tribes with eligibility for "the special programs and services provided by the United States to Indians because of their status as Indians."

To be sure, the List Act post-dates ISDA. But during the time between those two statutes, the Secretary of the Interior consistently recognized Indian tribes on the same terms and listed them as so recognized. *See* Procedures for Establishing that an American Indian Group Exists as an Indian Tribe, 43 Fed. Reg. 39,361, 39,362 (Sept. 5, 1978) ("[A]cknowledgment of tribal existence by the Department is a prerequisite to the protection, services, and benefits from the Federal Government available to Indian tribes. Such acknowledgment shall also mean that the tribe is entitled to the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their status as Indian tribes . . . .") (codified at 25 C.F.R. § 83.2 (1978)). Given the strikingly similar language between the List Act and ISDA, the term-of-art nature of that language, and its usage in administrative practice spanning several decades, we conclude that the List Act and ISDA must reflect the same understanding of tribal recognition.

The intervenors urge a different understanding of what kind of recognition ISDA requires. Rejecting the term-of-art understanding laid out above, the intervenors contend that an Alaska Native group is "recognized" within the meaning of ISDA if it receives any Indian-related funding or benefits, regardless of whether the federal government has acknowledged a sovereign-to-sovereign relationship with the group. Because some statutes fund programs for Alaska

Natives in part through ANCs, *see*, *e.g.*, 20 U.S.C. § 7453(b) (Alaska Native language immersion schools), the intervenors contend that that ANCs are therefore recognized Indian Tribes for ISDA purposes.

The intervenors' proposed interpretation cannot be reconciled with the text of ISDA. *First*, ISDA's recognition clause does not simply require the group to be "recognized as eligible" for *any* special program or service "provided by the United States to Indians because of their status as Indians." Instead, it requires the group to be "recognized as eligible for *the* special *programs and services* provided by the United States to Indians because of their status as Indians" (emphases added). Use of the definite article ("the") indicates that what follows "has been previously specified by context." *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019). Here, the only "special programs and services" (in the plural) plausibly specified by context are the "panoply of benefits and services" to which "recognized" tribes are entitled. *Frank's Landing*, 918 F.3d at 613–14. *Second*, the intervenors would read recognition out of ISDA; whereas the statute requires a group to be "recognized as eligible" for various special programs, the intervenors would read it to require only that the group be "eligible" to receive benefits or funding.

The ANCs have not satisfied the recognition clause as we construe it. They do not contend that the United States has acknowledged a political relationship with them government-to-government. Nor could they, for in 1978, the Interior Department promulgated regulations making "corporations … formed in recent times" ineligible for recognition. *See* 25 C.F.R. § 83.4(a). Under that regulation, which remains in effect, no ANC appears on the Secretary of the Interior's current list of recognized Indian tribes. *See* Indian Entities Recognized by and Eligible To Receive Services from the

18

United States Bureau of Indian Affairs, 85 Fed. Reg. 5,462 (Jan. 30, 2020). And because ANCs are not federally recognized, they are not Indian tribes under ISDA.

C

The government agrees that ANCs have not been "recognized" as ISDA requires. Indeed, it stresses that ANCs, which have never enjoyed any sovereign-to-sovereign relationship with the United States, could never be so recognized. For the government, the upshot is that ANCs need not satisfy the recognition clause to qualify as Indian tribes. Otherwise, the government reasons, Congress would have accomplished nothing by expressly adding "any Alaska native village *or regional or village corporation*" (emphasis added) to the list of possible recognized tribes. Given what the government describes as a misfit between the last noun in the statutory list ("corporation") and the adjectival clause that follows (including "recognized"), the government contends that the adjectival clause must be read to modify *every* listed noun *except* its immediate antecedent.

Fortunately, we need not choose between the government's interpretation, which produces grammatical incoherence, and a competing interpretation that would produce equally problematic surplusage. For we conclude that, although ANCs cannot be recognized as Indian tribes under current regulations, it was highly unsettled in 1975, when ISDA was enacted, whether Native villages or Native corporations would ultimately be recognized. The Alaska clause thus does meaningful work by extending ISDA's definition of Indian tribes to whatever Native entities ultimately were recognized—even though, as things later turned out, no ANCs were recognized.

For over a century, claims of tribal sovereignty in Alaska went largely unresolved. Soon after the Alaska Purchase, many courts held that Native villages were not sovereigns in control of some distinct "Indian country." *United States v. Seveloff*, 27 F. Cas. 1021, 1024 (C.C.D. Or. 1872); *Kie v. United States*, 27 F. 351, 351–52 (C.C.D. Or. 1886); *see also In re Sah Quah*, 31 F. at 329 ("The United States at no time recognized any tribal independence or relations among these Indians . . . ."). That view changed over the first half of the 20th century, yet there were still few occasions for the federal government to develop political relationships with the remote and isolated Native villages. Sansonetti Op. at *9, *15–16. Accordingly, the government addressed questions of Native sovereignty only "in a tentative and reactive way." *Id.* at *2. And when land disputes came to the fore in ANCSA, Congress complicated the question of Native sovereignty even more. As a general matter, Indian tribes must control a particular territory. *See, e.g.*, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982); *Montoya v. United States*, 180 U.S. 261, 266 (1901). But ANCSA terminated 22 of the 23 existing reservations in Alaska, 43 U.S.C. § 1618(a); extinguished all aboriginal land claims of Native individuals or tribes, *id.* § 1603; and transferred settlement proceeds not to the Native villages previously thought to have at least arguable sovereignty, but to newly-created corporations chartered under and thus subject to Alaska law, *id.* §§ 1605(c), 1606(d).

After the enactment of ISDA, questions persisted for nearly two more decades about the nature of tribal sovereignty in Alaska. In 1977, a congressional commission concluded that the sovereign powers of Alaska Native villages had been placed "largely in abeyance at the present time because the tribes currently do not possess tribal domains." 2 Am. Indian Pol'y Rev. Comm'n, No. 93-440, *Final Report*, 489, 490–491 & n.12 (1977). In 1988, the Alaska Supreme Court held that

Alaska Native villages had "not been accorded tribal recognition" (except for the tribe inhabiting the one remaining reservation) and thus lacked tribal sovereign immunity. *Native Vill. of Stevens v. Alaska Mgmt. & Planning*, 757 P.2d 32, 39–41 (Alaska 1988). And as late as January 1993, the Solicitor of Interior concluded that Alaska Native villages enjoyed some attributes of tribal sovereignty, but only after conducting an exhaustive historical survey and analysis of various conflicting considerations. Sansonetti Op. at *5–35, *75–76. Even then, the Solicitor concluded that this sovereignty did not extend to control over the lands transferred by ANCSA to the regional and village corporations. *Id.* at *75.

Moreover, ANCSA charged the new ANCs with a handful of functions that would ordinarily be performed by tribal governments, making potential future recognition of ANCs more plausible. For one thing, ANCs were the vehicle for implementing a global settlement encompassing all land claims that any Native individual or sovereign could bring against the United States. 43 U.S.C. § 1601(a). Moreover, the village corporations were charged with managing the land transferred by the United States not on behalf of their shareholders, but "on behalf of a Native village." *Id.* § 1602(j). And the regional corporations were authorized to "promote the health, education, or welfare" of Alaska Natives. *Id*. § 1606(r). That function is currently performed by two large cabinet agencies, the Department of Health and Human Services and the Department of Education, which at the time of ANCSA were constituted as a single Department of Health, Education, and Welfare. The intervenors themselves characterize ANCs as performing functions "that one would most naturally describe as governmental." Intervenor-Appellees' Br. at 35.

When ISDA was enacted, the standards and procedures for the United States to recognize Indian tribes also were unsettled.

At that time, recognition occurred in an "an ad hoc manner," with petitions for recognition evaluated "on a case-by-case basis," *Mackinac Tribe v. Jewell*, 829 F.3d 754, 756 (D.C. Cir. 2016), and "at the discretion" of the Interior Department, Procedures Governing Determination that Indian Group Is a Federally Recognized Indian Tribe, 42 Fed. Reg. 30,647, 30,647 (June 16, 1977). It was not until 1978 that the Department first promulgated regulations establishing uniform standards to govern the question whether to grant "formal recognition" to specific Indian groups. *Mackinac Tribe*, 829 F.3d at 756.

But even after promulgating those regulations, Interior still had difficulty sorting out whether to recognize Native villages, corporations, or both. In 1979, Interior published its first list of tribes recognized under the new regulatory criteria. The list contained no Alaska Native entities, which the agency said would be addressed "at a later date." Indian Tribal Entities that Have a Government-To-Government Relationship with the United States, 44 Fed. Reg. 7,235, 7,235 (Feb. 6, 1979). In 1988, Interior included both villages and corporations in a single list designated as "native entities within the State of Alaska recognized and eligible to receive services from the United States Bureau of Indian Affairs." Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 53 Fed. Reg. 52,829, 52,832–33 (Dec. 29, 1988) (cleaned up). Finally, Interior changed course in October 1993, publishing a substantially revised list of recognized Native entities that included over 200 Alaska Native villages, but no Alaska Native corporations. Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54,364 (Oct. 21, 1993). In the preamble to that list, Interior analogized Native corporations to "tribal organizations" in the lower 48 states, which were not recognized as Indian tribes. *See id.* at

54,365.  Moreover, it expressed concern that recognizing Native *corporations* as sovereign entities would undercut the case for so recognizing the traditional Native *villages*.  *See id.* As the leading Indian-law treatise explains, "the question of federal recognition of Alaska tribes" thus was not "definitively settled" until Interior published this "revised list of federally recognized tribes" in October 1993.  *Cohen's Handbook*, *supra*, § 4.07(3)(d)(ii).

In sum, when Congress enacted ISDA in 1975, it was substantially uncertain whether the federal government would recognize Native villages, Native corporations, both kinds of entities, or neither.  In the face of this uncertainty, Congress expanded the term "Indian tribe" to cover any Native "village or regional or village corporation" that was appropriately "recognized."  By including both villages and corporations, Congress ensured that any Native entities recognized by Interior or later legislation would qualify as Indian tribes. There is no surplusage problem simply because, almost two decades later, Interior chose to recognize the historic villages but not the newer corporations as the ultimate repository of Native sovereignty.

Finally, we reject the government's plea for deference. The government does not contend that its interpretation of ISDA is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), presumably because that interpretation has never been formally expressed, *see United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).  Instead, the government claims deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to the extent that its position is persuasive.  The government's position in this case traces back to an internal agency memorandum written by an Assistant Solicitor of Interior, who simply asserted that ANCs must be exempt from ISDA's

recognition clause in order to avoid statutory surplusage.  That memorandum did not address any of the textual or historical considerations set forth above.  Moreover, it appears inconsistent with a binding regulation adopted by the Department of the Treasury, the agency before the Court on this appeal.  The regulation provides that, under ISDA, "[e]ach such Indian Tribe" covered by the definition—"including any Alaska Native village or regional or village corporation" as defined in ANCSA—"must be recognized as eligible for special programs and services provided by the United States to Indians because of their status as Indians."  12 C.F.R. § 1805.104.  Because the Interior Department's administrative interpretation of ISDA has little persuasive power, we afford it no deference.  Likewise, we decline to follow *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471 (9th Cir. 1987), in which the Ninth Circuit accepted that interpretation.  *See id.* at 1473–76.

For these reasons, we read the ISDA definition to mean what it says, that Alaska Native villages and corporations count as an "Indian tribe" only if "recognized" as such.

D

The ANCs suggest that a ruling for the tribes would produce sweeping adverse consequences.  They worry that such a ruling would disentitle them not only from CARES Act funding, but also from funding under ISDA and the many other statutes that incorporate its "Indian tribe" definition.  This is far from obvious, for ISDA makes funding available to any "tribal organization," upon request by any "Indian tribe."  25 U.S.C. § 5321(a)(1).  And it further defines "tribal organization" to include not only "the recognized governing body of any Indian tribe," but also "any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body."  *Id.* § 5304(*l*).  The parties disagree on whether ANCs,

if requested to provide services by a recognized Native village, may receive ISDA funding as an "organization of Indians" that was "sanctioned" by the village to provide the services. We need not resolve that question, and so we leave it open.

The ANCs further claim flexibility to provide coronavirus relief to Alaska Natives who are not enrolled in any recognized village. Given the urgent need for relief, the ANCs say, we should broadly construe the CARES Act to direct funding to the entities best able to provide needed services. The short answer is that we must of course follow statutory text as against generalized appeals to sound policy. But we also note that ANCSA expressly preserves "any governmental programs otherwise available to the Native people of Alaska as citizens of the United States or the State of Alaska." 43 U.S.C. § 1626(a). We are confident that, if there are Alaska Natives uncared for because they are not enrolled in any recognized village, either the State of Alaska or the Department of Health and Human Services will be able to fill the void.

V

We hold that Alaska Native Corporations are not eligible for funding under Title V of the CARES Act. We thus reverse the grant of summary judgment to the government and the intervenors, as well as the denial of summary judgment to the plaintiff tribes.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring: It is, was and always will be, this court's duty "to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), but that does not mean we should be blind to the impact of our decisions. The COVID-19 pandemic is an unprecedented calamity, subjecting Americans to physical and economic suffering on a national scale. The virus respects no geographic or political boundaries and invades nearly every facet of life. And as the virus has swept through our Nation, it has disproportionately affected American Indian and Alaska Native communities.[1]

Although I join my colleagues in full, I write separately to express my view that this decision is an unfortunate and unintended consequence of high-stakes, time-sensitive legislative drafting.[2] It is indisputable that the services ANCs provide to Alaska Native communities—including healthcare, elder care, educational support and housing assistance—have been made only more vital due to the pandemic. I can think of no reason that the Congress would exclude ANCs (and thus exclude many remote and vulnerable Alaska Natives) from receiving and expending much-needed Title V funds.

---

[1] Press Release, Centers for Disease Control and Prevention, CDC data show disproportionate COVID-19 impact in American Indian/Alaska Native populations (Aug. 19, 2020), https://www.cdc.gov/media/releases/2020/p0819-covid-19-impact-american-indian-alaska-native.html.

[2] The CARES Act was drafted and required to be implemented on an extraordinarily short timeline. Only eight days elapsed between the CARES Act's introduction in the Senate on March 19 and the President's signature on March 27. *See* H.R. 784, 116th Cong. (2020) (enacted); S. 3548, 116th Cong. (2020). The CARES Act funds at issue were to be distributed no later than 30 days after enactment and any undistributed funds are scheduled to lapse on September 30. 42 U.S.C. § 801(a)(1), (b)(1).

Indian law, however, does not have a simple history or statutory scheme and "no amount of wishing will give it a simple future." *Lummi Indian Tribe v. Whatcom Cty.*, 5 F.3d 1355, 1360 (9th Cir.) (Beezer, J., dissenting), *as amended on denial of reh'g* (Dec. 23, 1993); s*ee also United States v. Lara*, 541 U.S. 193, 219 (2004) (Thomas, J., concurring) ("Federal Indian policy is, to say the least, schizophrenic."). Indian law's complexity and the pressure to provide swift relief may have proved too much in this case. ISDA is only one of the many statutes which define "Indian tribe" in less than clear—and even conflicting—terms.[3] I believe the Congress must have had reason to believe its definition would include ANCs but, by incorporating by reference ISDA's counter-intuitive definition, it did not, in fact, do so. As a result, many of our fellow citizens who depend on ANCs will not receive Title V aid. Nonetheless it is not this court's job to "soften . . . Congress' chosen words whenever [we] believe[] those words lead to a harsh result." *United States v. Locke*, 471 U.S. 84, 95 (1985). And a harsh result it is.

---

[3] For example, the Native American Housing Assistance and Self-Determination Act defines "Indian tribe" as a "federally recognized tribe" and defines "federally recognized tribe" as those tribes, Alaska Native villages or ANCs "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians *pursuant to [ISDA]*." 25 U.S.C. §4103(13)(B) (emphasis added).