# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 4, 2020            Decided January 5, 2021

No. 20-5286

SHAWNEE TRIBE,
APPELLANT

v.

STEVEN T. MNUCHIN, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE
TREASURY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-01999)

———

*Pilar M. Thomas* argued the cause for appellant. With her
on the briefs were *Luke Cass*, *Scott McIntosh*, and *Nicole L.
Simmons.*

*Michael G. Rossetti* was on the brief for *amicus curiae*
Prairie Band Potawatomi Nation in support of appellant.

*Daniel G. Jarcho* was on the brief for *amicus curiae* the
Miccosukee Tribe of Indians of Florida in support of appellant.

*Thomas Pulham*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jeffrey Bossert Clark*, Acting Assistant Attorney General, and *Michael S. Raab* and *Daniel Tenny*, Attorneys. *Adam C. Jed*, Attorney, entered an appearance.

Before: TATEL, GARLAND*, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Shawnee Tribe, located in Oklahoma, challenges the allocation of funds under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), which Congress enacted in response to the current public health emergency. The district court, finding that the allocation of funds under the CARES Act was unreviewable, denied the Tribe's motion for a preliminary injunction and then dismissed the case. For the reasons set forth below, we reverse and remand for the district court to consider the merits and to enter a preliminary injunction promptly.

**I.**

Title V of the CARES Act appropriated $150 billion "for making payments to States, Tribal governments, and units of local government," 42 U.S.C. § 801(a)(1), for "necessary expenditures incurred due to the public health emergency with respect to [COVID-19]," *id.* § 801(d)(1). Congress directed the Secretary of the Treasury to make the payments within thirty days of the Act's March 27, 2020 enactment. *Id.* § 801(b)(1).

---

* Judge Garland was a member of the panel at the time this case was argued but did not participate in the final disposition of the case.

Of the $150 billion, Congress reserved $8 billion for payments to "Tribal governments," *id.* § 801(a)(2)(B), and specified that the amount to be paid

> to a Tribal government shall be the amount the Secretary [of the Treasury] shall determine, in consultation with the Secretary of the Interior and Indian Tribes, that is based on increased expenditures of each such Tribal government . . . relative to aggregate expenditures in fiscal year 2019 by the Tribal government . . . and determined in such manner as the Secretary determines appropriate to ensure that all amounts available . . . for fiscal year 2020 are distributed to Tribal governments.

*Id.* § 801(c)(7).

Following consultation with Tribal government representatives, the Secretary published on April 13 a form requesting enrollment data from all 574 federally recognized Tribal governments "to help apportion Title V funds." *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 976 F.3d 15, 20 (D.C. Cir. 2020). In response, the Shawnee Tribe certified that it had 3,021 enrolled members.

The Secretary subsequently announced his chosen methodology for distributing funds. *See* U.S. Department of the Treasury, *Coronavirus Relief Fund Allocations to Tribal Governments* (May 5, 2020) ("May 5 Document"), https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf. Because data about increased expenditures for fiscal year 2020 were "unknown" and could only be "estimate[d]" at that point, the Secretary "determined that it [was] reasonable and appropriate to allocate payments based on a formula [that] takes into account population data, employment data, and expenditure

data." *Id.* at 1. Sixty percent of the $8 billion would be distributed "immediately based on population," while the remaining forty percent would be distributed later "based on employment and expenditures data." *Id.* at 2.

For the sixty percent based on population, the Secretary explained that "Tribal population [wa]s expected to correlate reasonably well with the amount of increased expenditures of Tribal governments related directly to the public health emergency, such as increased costs to address medical and public health needs." *Id.* Rather than using the enrollment numbers submitted by the tribes, however, the Secretary relied on "Tribal population data used by the Department of Housing and Urban Development (HUD) in connection with the Indian Housing Block Grant (IHBG) program." *Id.* According to the Secretary, the data were "reliable and consistently-prepared," and the Tribal governments were "familiar" with the data and had been able to previously "scrutinize and challenge its accuracy." *Id.*

The IHBG data does not reflect actual tribal enrollment. Instead, it estimates a tribe's "population" in a geographical "formula area" based on population numbers drawn from census projections of the number of individuals who consider themselves "American Indian or Alaska Native" on census forms. *See* 24 C.F.R. §§ 1000.302, 1000.330; *see also* May 5 Document at 2. A Tribal government's formula area is defined to be its formula area as it existed in 2003, any of its land that falls into nine categories (including "reservations for federally recognized Indian tribes"), and any other areas added by application of the Tribe and at HUD's discretion. *See* 24 C.F.R. § 1000.302. A formula area, the Secretary explained, "corresponds broadly with the area of a Tribal government's jurisdiction and other areas to which the Tribal government's provision of services and economic influence extend." May 5

Document at 2–3. Because the IHBG data does not reflect actual enrollment, a tribe's IHBG "population" sometimes exceeds its actual enrollment numbers. 24 C.F.R. § 1000.302. A tribe's IHBG formula area population is thus capped at twice its "enrolled population." *Id.* § 1000.302(5).

The Secretary's decision to use IHBG data had an unfortunate impact on the Shawnee Tribe. Even though the table displaying the IHBG data included HUD enrollment figures indicating that the Tribe had 2,113 enrolled members, the IHBG data reported that the Tribe had a formula area population of zero. So although the Tribe had over $6.6 million in expenditures in 2019, Compl. Ex. A, and although it "incurred significant medical and public health expenses in responding to the devastation resulting from the COVID-19 pandemic," *id.* ¶ 62, it received just $100,000—the minimum payment for tribes with a population of fewer than thirty-seven, *id*. ¶ 26. *See Barker v. Conroy*, 921 F.3d 1118, 1121 (D.C. Cir. 2019) (explaining that on "appeal from the district court's grant of a motion to dismiss, 'we must accept as true all material allegations of the complaint'" (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011))). Twenty-four other tribes also had formula area populations of zero, including amicus curiae Miccosukee Tribe of Indians of Florida, which has 605 enrolled members. Miccosukee Tribe's Br. 2.

On June 18, the Shawnee Tribe sued the Department of the Treasury, the Secretary of the Treasury, the Department of the Interior, and the Secretary of the Interior (collectively, the Secretary) in the Northern District of Oklahoma. *See Shawnee Tribe v. Mnuchin* (*Shawnee Tribe I*), No. 20-CV-290, 2020 WL 4334908 (N.D. Okla. July 28, 2020). Seeking declaratory and injunctive relief, the Tribe contended that the Secretary acted arbitrarily, capriciously, and unlawfully by using population as a proxy for increased expenditures,

selecting the IHBG population data rather than other available data, and refusing to adjust what the Tribe deemed errors in the IHBG data. *See id.* at *1–2; Compl. ¶¶ 45–52. The Tribe also filed a motion for a temporary restraining order. The Oklahoma district court converted the motion to a motion for a preliminary injunction and transferred the case to the district court here. *Shawnee Tribe I*, 2020 WL 4334908, at *1, 3–4.

The district court denied the Tribe's motion for a preliminary injunction. *See Shawnee Tribe v. Mnuchin* (*Shawnee Tribe II*), No. 20-CV-1999 (APM), 2020 WL 4816461 (D.D.C. Aug. 19, 2020). Although "accept[ing]" that the Tribe would suffer irreparable harm, *id.* at *4 n.3, the court concluded that the Tribe had failed to satisfy the other requirements for preliminary relief, *id.* at *2–4. According to the district court, the Tribe failed to show a likelihood of success on the merits because the Secretary's allocation of funds under Title V was "committed to agency discretion" and thus unreviewable under the Administrative Procedure Act (APA). *Id.* The district court also found that the balance of equities weighed against granting preliminary relief. *Id.* at *4–5.

The Secretary subsequently moved to dismiss, again arguing that the allocation of Title V funds was unreviewable. Relying on and incorporating its reasoning in its opinion on the preliminary injunction, as well as in an earlier decision it had issued in a similar case brought by the Prairie Band Potawatomi Nation, *see Prairie Band Potawatomi Nation v. Mnuchin*, No. 20-cv-1491 (APM), 2020 WL 3402298 (D.D.C. June 11, 2020), the district court agreed and dismissed the case. *Shawnee Tribe v. Mnuchin* (*Shawnee Tribe III*), No. 20-CV-1999 (APM), 2020 WL 5440552, at *1–2 (D.D.C. Sept. 10, 2020). The Tribe appealed both decisions and a motions panel

of this court granted expedition. Order, *Shawnee Tribe v. Mnuchin*, No. 20-5286 (D.C. Cir. Sept. 25, 2020).

**II.**

The same motions panel that expedited the case also directed the parties to "address whether this Court can provide relief to appellant after the CARES Act appropriation lapses or the remaining CARES Act funds are obligated." *Id.* The Secretary and the Tribe agree that there are no immediate mootness concerns, as do we.

"[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Sanchez v. Office of the State Superintendent of Education*, 959 F.3d 1121, 1125 (D.C. Cir. 2020) (alteration in original) (internal quotation marks omitted). In the appropriations context, our court has recognized "an equitable doctrine . . . that permits a court to award funds based on an appropriation even after the date when the appropriation lapses, so long as the lawsuit was instituted *on or before that date*." *City of Houston v. Department of Housing & Urban Development*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (internal quotation marks omitted); *see* 1 U.S. Government Accountability Office, *Principles of Federal Appropriations Law*, 5-85 (3d ed. 2004) ("As long as the suit is filed prior to the expiration date, the court acquires the necessary jurisdiction and has the equitable power to 'revive' expired budget authority, even where preservation is first directed at the appellate level."). But "even if a plaintiff brings suit before an appropriation lapses, this circuit's case law unequivocally provides that once the relevant funds have been obligated" to a particular purpose or entity, "a court cannot reach them in order to award relief." *City of Houston*, 24 F.3d at 1426.

In this case, the Tribe filed suit on June 18, over three months before the appropriation lapsed on September 30. *See* 42 U.S.C. § 801(a)(1). Moreover, there is no risk that the "relevant funds" will be "obligated" before the courts can act, *City of Houston*, 24 F.3d at 1426, given that in a related case, *Miccosukee Tribe of Indians of Florida v. United States Department of the Treasury*, the district court ordered the government to provide it "with notice of at least three business days before disbursing Title V funds below the level necessary to pay the amounts claimed by Plaintiffs in th[at] case" and in this case. Minute Order, *Miccosukee Tribe of Indians of Florida v. United States Department of the Treasury*, No. 20-cv-2792 (D.D.C. Dec. 14, 2020).

**III.**

We start with the district court's conclusion, defended by the Secretary, that the allocation of Title V funds is unreviewable. Although "[t]here is a strong presumption of reviewability under the" APA, section 701(a) "expressly precludes judicial review of agency action 'committed to agency discretion by law.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting 5 U.S.C. § 701(a)(2)). "That provision imposes two related, but distinct, barriers to judicial review." *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020).

First, the Supreme Court has "read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)). Certain agency decisions are thus "presumed immune from judicial review." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). Second, "even if agency action is presumptively *reviewable*, section 701(a)(2) also applies 'in those rare instances where statutes are drawn in such

broad terms that in a given case there is no law to apply.'" *Physicians for Social Responsibility*, 956 F.3d at 642 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). "That is, 'if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion,' then there can be no judicial review." *Id.* (quoting *Heckler*, 470 U.S. at 830). The Secretary argues that the Tribe cannot overcome either barrier.

Relying on the Supreme Court's decision in *Lincoln v. Vigil*, 508 U.S. 182, the Secretary first argues that Title V is a lump sum appropriation and that his allocation of Title V funds is therefore unreviewable. In *Lincoln*, the Court held that "where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions." *Id.* at 192 (internal quotation marks omitted). "[A] lump-sum appropriation," the Court explained, "reflects a congressional recognition that an agency must be allowed flexibility to shift funds within a particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 193 (alterations omitted) (internal quotation marks omitted). In *Lincoln*, plaintiffs challenged the Indian Health Service's decision to discontinue a program providing services to "handicapped Indian children in the Southwest." *Id.* at 184. The Court pointed out, however, that "the appropriations Acts for the relevant period d[id] not so much as mention the Program," and the other two relevant statutes "likewise sp[oke] about Indian health only in general terms." *Id.* at 193–94. Accordingly, the Court concluded, the Service's decision to end the program was unreviewable.

Title V is nothing like the statutes at issue in *Lincoln*. Congress has not left the Secretary any "flexibility to shift

funds within a particular appropriation account so that [he] can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 193 (alterations omitted) (internal quotation marks omitted). Quite to the contrary, Title V appropriates funds for only "necessary expenditures incurred due to the public health emergency with respect to" COVID-19. 42 U.S.C. § 801(d)(1). The statute, moreover, directs the Secretary to (1) "ensure that all amounts available" be "distributed to Tribal governments," *id.* § 801(c)(7); (2) "base[]" the allocation of funds "on increased expenditures . . . relative to aggregate expenditures in fiscal year 2019," *id.*; and (3) "pay each . . . Tribal government" no "later than 30 days" after the Act's enactment, *id.* § 801(b)(1). In other words, Congress has "circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statute[]." *Lincoln*, 508 U.S. at 193. Title V thus carries no presumption of non-reviewability.

Invoking section 701(a)(2)'s second barrier to judicial review, the Secretary argues that, even if his allocation decisions are presumptively reviewable, there is still no law for us to apply because Title V provides that the Secretary must allocate funds "in such manner as [he] determines appropriate." *See* 42 U.S.C. § 801(c)(7). If that were all Title V said, the Secretary would have a point. But the statute says much more: that the "amount paid to a Tribal government" shall be "based on increased expenditures . . . relative to aggregate expenditures . . . *and* determined in such manner as the Secretary determines appropriate to ensure that all amounts available . . . are distributed to Tribal governments." *Id.* (emphasis added). To be sure, the provision gives the Secretary some discretion, but that discretion is limited to "determin[ing]" a method for allocating funds that is "based on increased expenditures" and that is "appropriate to ensure that all amounts available . . . are distributed." *Id.* In other words,

however the Secretary chooses to exercise his discretion, he must ensure that (1) the "amount paid to . . . a Tribal government" is "based on increased expenditures" and (2) "all amounts available . . . are distributed to Tribal governments." *Id.* This is more than enough to provide us with a "judicially manageable standard" against "which to judge the [Secretary's] action." *Steenholdt*, 314 F.3d at 638 (internal quotation marks omitted).

This case, then, is very much like *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019). There, emphasizing that APA section 701(a)(2) is read "quite narrowly," the Supreme Court held that despite the Census Act "confer[ring] broad authority on the Secretary" of Commerce by instructing him to "take a decennial census of population in such form and content as he may determine," the Act did "not leave his discretion unbounded" because various provisions constrained his authority. *Id.* at 2568–69 (internal quotation marks omitted). Here, as there, by requiring that the allocations be "based on increased expenditures," Congress has not left the Secretary with "unbounded" discretion. *See id.* Indeed, our court has found agency action to be judicially reviewable when taken pursuant to statutes containing far more permissive language. Examples include a statute mandating that the Armed Forces Retirement Home's Chief Operating Officer "shall" provide "high quality and cost-effective" healthcare, *Cody v. Cox*, 509 F.3d 606, 611 (D.C. Cir. 2007); an appropriations act providing that the "moneys" were for "economic losses incurred during 1999," *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (internal quotation marks omitted); a statute that allowed a board to excuse a failure to file a request to correct an error in a military record within a certain time period only if "it f[ound] it to be in the interest of justice," *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1402 (D.C. Cir. 1995); and regulations providing

that the General Services Administration "must . . . assure" compliance with federal ethics rules, *Physicians for Social Responsibility*, 956 F.3d at 643–44.

We thus have jurisdiction to review the Tribe's challenge to the Secretary's allocation of Title V funds. The Tribe urges us to proceed to the merits and find that the Secretary's "methodology based on population and use of IHBG data was arbitrary and capricious, and violated the APA as a matter of law." Appellant's Br. 42. But as the Secretary points out, "the Tribe never moved for summary judgment in [the] district court," that court did "not address[] the merits of the Tribe's APA claim," and "the administrative record has not been filed in this case." Appellee's Br. 34. Under these circumstances, we think it best for the district court to consider the merits in the first instance. *See Perot v. FEC*, 97 F.3d 553, 561 (D.C. Cir. 1996) (declining to reach the merits of an APA claim when "no party ha[d] produced the administrative record," "th[e] issue was not fully briefed," and "the district court did not have the opportunity to consider the [challenged] regulations' legality in terms of that record or the APA and the case law under it"); *CC Distributors, Inc. v. United States*, 883 F.2d 146, 156 (D.C. Cir. 1989) (remanding a case to the district court because remand "would give the district court the benefit of the parties' arguments concerning" the relevant regulations "and thereby facilitate the proper disposition of plaintiffs' claim").

## IV.

This brings us finally to the Tribe's challenge to the district court's order denying its motion for a preliminary injunction. To obtain a preliminary injunction, "the moving party must make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Archdiocese of*

*Washington v. Washington Metropolitan Area Transit Authority*, 897 F.3d 314, 321 (D.C. Cir. 2018) (internal quotation marks omitted). Although "[w]e review the district court's ultimate decision to deny injunctive relief, as well as its weighing of the preliminary injunction factors, for abuse of discretion," we "review the district court's legal conclusions de novo." *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). Here, the district court's conclusion that the Tribe had failed to demonstrate a likelihood of success on the merits rested, as did the court's dismissal of the case, on a legal error: that the Secretary's allocation of Title V funds is unreviewable. Accordingly, we shall reverse the district court's denial of the Tribe's motion for a preliminary injunction.

The Secretary urges us to remand the question of preliminary relief for the district court to consider. But unlike the merits, the parties have fully briefed this issue, and counsel for the Secretary acknowledged at oral argument that the record is adequate to consider the Tribe's motion for a preliminary injunction. Oral Arg. Rec. 22:29–23:45. Given this, and given the urgency of the matter, we shall resolve the preliminary injunction question here and now. Because the Secretary does not challenge the Tribe's claim that it will suffer irreparable harm, *see* Oral Arg. Rec. 24:01–31, our analysis focuses on the three remaining factors, beginning with likelihood of success on the merits.

The Secretary chose the IHBG formula area population data as a proxy for "increased expenditures." *See* May 5 Document at 1–3. But as the Tribe points out, and as the record demonstrates, the IHBG formula area population data is, at least with respect to some tribes, an unsuitable proxy. Even though the Shawnee Tribe alleges (unchallenged by the Secretary) that it has 3,021 enrolled members and that it had expenditures of some $6.65 million in 2019, the IHBG formula

area population data indicates that the Tribe had a population of zero. *See* Compl. Ex. A. As a result, the Tribe received the minimum payment of $100,000, even though it "has incurred significant medical and public health expenses in responding to the devastation resulting from the COVID-19 pandemic" by, for instance, "provid[ing] essential services to its citizens residing on-reservation and off-reservation." *See id.* ¶ 62. The same is likely true for amicus the Miccosukee Tribe—according to its brief, it has 605 enrolled members yet the IHBG data indicates it had zero population—as well as for the Eastern Delaware Band of Indians, which, according to the IHBG data table, had a HUD enrollment figure of 11,014 but a population of zero. *See* Miccosukee Tribe's Br. 2; Compl. Ex. B at 10. Moreover, the Secretary himself acknowledged that the IHBG data was inadequate as a proxy for increased expenditures in some cases when he requested population data from HUD for three tribes that did not participate in the IHBG program, *see* May 5 Document at 3; U.S. Department of the Treasury, *Coronavirus Relief Fund Frequently Asked Questions on Tribal Population* at 1 (June 4, 2020), https://home.treasury.gov/system/files/136/FAQ-on-Tribal-Population-Data.pdf, yet he failed to do the same for the Shawnee Tribe, which also does not participate in the program, Compl. ¶ 47. Nor did the Secretary explain why he failed to seek alternative information for the Shawnee Tribe or the twenty-four other tribes with no IHBG population. On this record, then, the Shawnee Tribe is likely to succeed in its claim that the IHBG data is not a suitable proxy for "increased expenditures." *See* 42 U.S.C. § 801(c)(7).

The last two factors—harm to the opposing party and the public interest—also favor the Tribe. Where, as here, "the Government is the opposing party," the last two factors "merge": "the government's interest *is* the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing America's*

*Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). A party's likelihood of success on the merits "is a strong indicator that a preliminary injunction would serve the public interest" because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Here, the Tribe is likely to succeed in showing that the Secretary is distributing congressionally appropriated funds in violation of the authorizing statute, and the public interest therefore favors the Tribe.

The Secretary insists that granting a preliminary injunction will "forc[e] [him] to create a whole new methodology based on a different data set with other flaws, or to make individualized determinations for each tribe, risking further delay of the distribution of funds." Appellee's Br. 44. The Tribe, however, seeks an injunction prohibiting the Secretary from distributing only $12 million of the remaining Title V funds. Whether the Secretary will have to devise a new methodology depends on the merits, which the district court will address in the first instance.

**V**.

For the foregoing reasons, we reverse the district court's order dismissing the case and remand for further proceedings consistent with this opinion. We also reverse the district court's order denying the Tribe's motion for a preliminary injunction and remand for it to enter a preliminary injunction promptly.

*So ordered.*