7/28/2021 10:54:48 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **20-543.pdf** | versus | **20-543_new.pdf** |
| **46 pages (230 KB)** | | **46 pages (229 KB)** |
| 6/25/2021 8:34:55 AM | | 7/28/2021 10:48:42 AM |

**Total Changes**

**2**

**Content**

2 Replacements

0 Insertions

0 Deletions

**Styling and Annotations**

0 Styling

0 Annotations

Go to First Change (page 30)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## YELLEN, SECRETARY OF TREASURY *v.* CONFEDERATED TRIBES OF THE CHEHALIS RESERVATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 20–543. Argued April 19, 2021—Decided June 25, 2021*

Title V of the Coronavirus Aid, Relief, and Economic Security (CARES) Act allocates $8 billion to "Tribal governments" to compensate for unbudgeted expenditures made in response to COVID–19. 42 U. S. C. §801(a)(2)(B). The question in these cases is whether Alaska Native Corporations (ANCs) are eligible to receive any of that $8 billion. Under the CARES Act, a "Tribal government" is the "recognized governing body of an Indian tribe" as defined in the Indian Self-Determination and Education Assistance Act (ISDA). §§801(g)(5), (1). ISDA, in turn, defines an "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act [(ANCSA),] which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U. S. C. §5304(e).

Consistent with the Department of the Interior's longstanding view that ANCs are Indian tribes under ISDA, the Department of the Treasury determined that ANCs are eligible for relief under Title V of the CARES Act, even though ANCs are not "federally recognized tribes" (*i.e.,* tribes with which the United States has entered into a government-to-government relationship). A number of federally recognized

————

*Together with No. 20–544, *Alaska Native Village Corp. Association et al.* v. *Confederated Tribes of the Chehalis Reservation et al.,* also on certiorari to the same court.

tribes sued. The District Court entered summary judgment for the Treasury Department and the ANCs, but the Court of Appeals for the District of Columbia Circuit reversed.

*Held*: ANCs are "Indian tribe[s]" under ISDA and thus eligible for funding under Title V of the CARES Act. Pp. 7–28.

(a) The ANCs argue that they fall under the plain meaning of ISDA's definition of "Indian tribe." Respondents ask the Court to adopt a term-of-art construction that equates being "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians" with being a "federally recognized tribe." Pp. 7–25.

(1) Under the plain meaning of ISDA, ANCs are Indian tribes. ANCs are "established pursuant to" ANCSA and thereby "recognized as eligible" for that Act's benefits. ANCSA, which made ANCs eligible to select tens of millions of acres of land and receive hundreds of millions of tax-exempt dollars, 43 U. S. C. §§1605, 1610, 1611, is a special program provided by the United States to "Indians," *i.e.,* Alaska Natives. Given that ANCSA is the only statute ISDA's "Indian tribe" definition mentions by name, eligibility for ANCSA's benefits satisfies the definition's final "recognized-as-eligible" clause. Pp. 7–11.

(2) Respondents ask the Court to read ISDA's "Indian tribe" definition as a term of art. But respondents fail to establish that the language of ISDA's recognized-as-eligible clause was an accepted way of saying "a federally recognized tribe" in 1975, when ISDA was passed. Nor is the mere inclusion of the word "recognized" enough to import a term-of-art meaning. Respondents also fail to show that the language of the recognized-as-eligible clause later became a term of art that should be backdated to ISDA's passage in 1975. Pp. 11–18.

(3) Even if ANCs did not satisfy the recognized-as-eligible clause, they would still satisfy ISDA's definition of an "Indian tribe." If respondents were correct that only a federally recognized tribe can satisfy that clause, then the best way to read the "Indian tribe" definition would be for the recognized-as-eligible clause not to apply to ANCs at all. Otherwise, despite being prominently "includ[ed]" in the "Indian tribe" definition, 25 U. S. C. §5304(e), all ANCs would be excluded by a federal-recognition requirement there is no reasonable prospect they could ever satisfy. Pp. 18–23.

(4) Respondents' remaining arguments that ANCs are not Indian tribes under ISDA are unpersuasive. They first argue that the ANCs misrepresent how meaningful a role they play under ISDA because the actual number of ISDA contracts held by ANCs is negligible. This point is largely irrelevant. No one would argue that a federally recognized tribe was not an Indian tribe under ISDA just because it had never entered into an ISDA contract. Respondents further argue that

treating ANCs as Indian tribes would complicate the administration of ISDA. But respondents point to no evidence of such administrative burdens in the 45 years the Executive Branch has treated ANCs as Indian tribes. Respondents also warn that blessing ANCs' status under ISDA will give ANCs ammunition to press for participation in other statutes that incorporate ISDA's "Indian tribe" definition. This concern cuts both ways, as adopting respondents' position would presumably exclude ANCs from the many other statutes incorporating ISDA's definition, even those under which ANCs have long benefited. Pp. 23–25.

(b) One respondent tribe further argues that the CARES Act excludes ANCs regardless of whether they are Indian tribes under ISDA, because ANCs do not have a "recognized governing body." In the ISDA context, the term "recognized governing body" has long been understood to apply to an ANC's board of directors, and nothing in either the CARES Act or ISDA suggests that the term places additional limits on the kinds of Indian tribes eligible to benefit under the statutes. Pp. 26–27.

976 F. 3d 15, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, KAVANAUGH, and BARRETT, JJ., joined, and in which ALITO, J., joined as to Parts I, II–C, II–D, III, and IV. GORSUCH, J., filed a dissenting opinion, in which THOMAS and KAGAN, JJ., joined.

1

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 20–543 and 20–544

JANET L. YELLEN, SECRETARY OF THE
TREASURY, PETITIONER

20–543            *v.*

CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION, ET AL.


ALASKA NATIVE VILLAGE CORPORATION
ASSOCIATION, INC., ET AL., PETITIONERS

20–544            *v.*

CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 25, 2021]

JUSTICE SOTOMAYOR delivered the opinion of the Court.*

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 134 Stat. 281. Title V of the Act allocates $8 billion of monetary relief to "Tribal governments." 134 Stat. 502, 42 U. S. C. §801(a)(2)(B). Under the CARES Act, a "Tribal government" is the "recognized governing body of an Indian tribe" as defined in the Indian Self-Determination and Education Assistance Act (ISDA). §§801(g)(5), (1). ISDA, in turn, defines an "Indian tribe" as "any Indian tribe, band, nation,

---

*JUSTICE ALITO joins Parts I, II–C, II–D, III, and IV of this opinion.

or other organized group or community, including any
Alaska Native village or regional or village corporation as
defined in or established pursuant to the Alaska Native
Claims Settlement Act[,] which is recognized as eligible for
the special programs and services provided by the United
States to Indians because of their status as Indians."  25
U. S. C. §5304(e).

The Department of the Treasury asked the Department
of the Interior, the agency that administers ISDA, whether
Alaska Native Corporations (ANCs) meet that definition.
Consistent with its longstanding view, the Interior Depart-
ment said yes.  The Treasury Department then set aside
approximately $500 million of CARES Act funding for the
ANCs.  The question presented is whether ANCs are "In-
dian tribe[s]" under ISDA, and are therefore eligible to re-
ceive the CARES Act relief set aside by the Treasury De-
partment.  The Court holds that they are.

I

This is not the first time the Court has addressed the
unique circumstances of Alaska and its indigenous popula-
tion.  See, *e.g.*, *Sturgeon* v. *Frost*, 587 U. S. ___ (2019); *Stur-
geon* v. *Frost*, 577 U. S. 424 (2016); *Alaska* v. *Native Village
of Venetie Tribal Government*, 522 U. S. 520 (1998);
*Metlakatla Indian Community* v. *Egan*, 369 U. S. 45 (1962).
The "simple truth" reflected in those prior cases is that
"Alaska is often the exception, not the rule."  *Sturgeon*, 577
U. S., at 440.  To see why, one must first understand the
United States' unique historical relationship with Alaska
Natives.

A

When the United States purchased the Territory of
Alaska from Russia in 1867, Alaska Natives lived in com-
munities dispersed widely across Alaska's 365 million
acres.  In the decades that followed, "[t]here was never an

attempt in Alaska to isolate Indians on reservations," as there had been in the lower 48 States. *Metlakatla Indian Community*, 369 U. S., at 51. As a consequence, the claims of Alaska Natives to Alaskan land remained largely unsettled even following Alaska's admission to the Union as our 49th State in 1959.[1] See Alaska Statehood Act, §4, 72 Stat. 339; *Sturgeon*, 577 U. S., at 429.

That changed in 1971 with the Alaska Native Claims Settlement Act (ANCSA). 85 Stat. 688, 43 U. S. C. §1601 *et seq.* ANCSA officially dispensed with the idea of recreating in Alaska the system of reservations that prevailed in the lower 48 States. It extinguished Alaska Natives' claims to land and hunting rights and revoked all but one of Alaska's existing reservations. §1610. In exchange, "Congress authorized the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations that were to be formed pursuant to" ANCSA. *Native Village of Venetie Tribal Government*, 522 U. S., at 524. These corporations are called ANCs.

Relevant here, ANCs come in two varieties: regional ANCs and village ANCs. To form the regional ANCs, the Act directed the Secretary of the Interior to divide Alaska into 12 geographic regions. §1606(a). Within each region,

———————

[1] There were some exceptions. Congress created by statute two Alaska Native reservations: the Annette Islands Reserve in 1891 and the Klukwan Reserve in 1957. See Act of Mar. 3, 1891, §15, 26 Stat. 1101; Act of Sept. 2, 1957, Pub. L. 85–271, 71 Stat. 596. Under the 1936 Amendment to the Indian Reorganization Act, ch. 254, 49 Stat. 1250, six further reservations were formed. See Letter from T. Sansonetti, Solicitor of the U. S. Dept. of Interior, to M. Lujan, Jr., Secretary of Interior 33 (Jan. 11, 1993). Alaska also saw the creation of certain "executive order reserves," which were more limited in purpose and scope and, like all reserves in Alaska besides the Annette Islands Reserve, were ultimately revoked by the Alaska Native Claims Settlement Act (ANCSA). See generally D. Case & D. Voluck, Alaska Natives and Americans Laws 85–112 (3d ed. 2012).

Alaska Natives were instructed to "incorporate under the laws of Alaska a Regional Corporation to conduct business for profit." §1606(d). To form the village ANCs, the Act identified approximately 200 Alaska "Native villages," a term encompassing any community of 25 or more Alaska Natives living together as of the 1970 census. §§1602(c), 1610(b), 1615(a). For each Alaska Native village, ANCSA ordered the "Native residents" to create an accompanying village corporation to "hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf" of the village. §§1602(j), 1607(a). ANCSA then directed the Secretary to prepare a roll showing the region and, if applicable, village to which each living Alaska Native belonged. §1604. Enrolled Alaska Natives then received shares in their respective ANCs. §§1606(g), 1607.

B

In 1975, four years after ANCSA's enactment, Congress passed ISDA. 25 U. S. C. §5301 *et seq.* ISDA answered the call for a "new national policy" of "autonomy" and "control" for Native Americans and Alaska Natives. H. R. Doc. No. 91–363, p. 3 (1970); see also *Menominee Tribe of Wis.* v. *United States*, 577 U. S. 250, 252 (2016) ("Congress enacted [ISDA] in 1975 to help Indian tribes assume responsibility for aid programs that benefit their members").

ISDA decentralized the provision of federal Indian benefits away from the Federal Government and toward Native American and Alaska Native organizations. ISDA allows any "Indian tribe" to request that the Secretary of the Interior enter into a self-determination contract with a designated "tribal organization." §5321(a)(1). Under such a contract, the tribal organization delivers federally funded economic, infrastructure, health, or education benefits to the tribe's membership.

As originally drafted, ISDA's "Indian tribe" definition did not mention ANCs. H. R. 6372, 93d Cong., 1st Sess., §1(a)

(1973) (defining "Indian tribe" to mean "an Indian tribe, band, nation, or Alaska Native Community for which the Federal Government provides special programs and services because of its Indian identity"). Prior to passage, however, the definition was amended twice to include, first, Alaska Native villages and, second, ANCs. See H. R. Rep. No. 93–1600, p. 14 (1974) ("The Subcommittee amended the definition of 'Indian tribe' to include regional and village corporations established by [ANCSA]"). Today, ISDA defines an "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to [ANCSA], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." §5304(e).[2]

Despite the express inclusion of ANCs in the definition of "Indian tribe," a question arose in the Interior Department whether the "recognized-as-eligible clause" limits the definition to "federally recognized tribes" only. A federally recognized tribe is one that has entered into "a government-to-government relationship [with] the United States." 1 F. Cohen, Handbook of Federal Indian Law §3.02[3] (N. Newton ed. 2012). This recognition can come in a number of ways: "from treaty, statute, executive or administrative order, or from a course of dealing with the tribe as a political entity." W. Canby, American Indian Law in a Nutshell 4 (7th ed. 2020). As private companies incorporated under state law, ANCs have never been "recognized" by the United States in this sovereign political sense.

In 1976, the year after ISDA's enactment, the Interior Department's Assistant Solicitor for Indian Affairs issued a

———————
[2] In 1990, Congress made "technical corrections" to ISDA. S. Rep. No. 101–226, p. 10 (1989). Relevant here, Congress inserted a comma after the "Indian tribe" definition's reference to ANCSA, bringing the definition to what it is today. Act of May 24, 1990, §2(a)(1), 104 Stat. 206.

memorandum on the status of ANCs under ISDA. App. 44–
48. In the Assistant Solicitor's view, the express inclusion
of ANCs within the definition of "Indian tribe" confirmed
that ANCs are Indian tribes under ISDA, even though they
are not federally recognized tribes. In the decades since,
the Interior Department has repeatedly reaffirmed that po-
sition. See, *e.g.*, 60 Fed. Reg. 9250 (1995) (ANCs "ha[ve]
been designated as 'tribes' for the purposes of some Federal
laws," including ISDA); 58 Fed. Reg. 54364 (1993) (ANCs
"are not governments, but they have been designated as
'tribes' for the purposes of" ISDA); 53 Fed. Reg. 52833
(1988) (ISDA "specifically include[s]" ANCs).

C

In 2020, Congress incorporated ISDA's "Indian tribe" def-
inition into the CARES Act. 42 U. S. C. §801(g)(1). Title V
of the Act allocates $150 billion to "States, Tribal govern-
ments, and units of local government" to compensate for un-
budgeted expenditures made in response to COVID–19.
§801(a)(1). Of that $150 billion, $8 billion is reserved for
"Tribal governments." §801(a)(2)(B). A "Tribal govern-
ment" is the "recognized governing body of an Indian Tribe,"
as ISDA defines the latter term. §§801(g)(5), (1).

On April 23, 2020, the Treasury Department determined
that ANCs are eligible for CARES Act relief, and set aside
more than $500 million for them (since reduced to approxi-
mately $450 million). App. 53–54; Letter from E. Prelogar,
Acting Solicitor General, to S. Harris, Clerk of Court (May
12, 2021). Soon after the Treasury Department's announce-
ment, a number of federally recognized tribes (respondents)
sued, arguing that only federally recognized tribes are In-
dian tribes under ISDA, and thus under the CARES Act.
Some Tribes further argued that ANCs do not have a "rec-
ognized governing body" for purposes of the CARES Act and
are ineligible to receive its funding for that reason as well.

The suits were consolidated in the District Court for the

District of Columbia, which ultimately entered summary judgment for the Treasury Department and the ANCs. The Court of Appeals for the District of Columbia Circuit reversed. *Confederated Tribes of Chehalis Reservation* v. *Mnuchin*, 976 F. 3d 15 (2020). In its view, the recognized-as-eligible clause is a term of art requiring any Indian tribe to be a federally recognized tribe. Because no ANC is federally recognized, the court reasoned, no ANC qualifies for funding under Title V of the CARES Act. In so holding, the D. C. Circuit split with the Ninth Circuit, which had held decades prior in *Cook Inlet Native Assn.* v. *Bowen*, 810 F. 2d 1471 (1987), that ANCs are Indian tribes for ISDA purposes, regardless of whether they have been federally recognized. *Id.*, at 1474.

We granted certiorari, 592 U. S. \_\_\_ (2021), to resolve the Circuit split and determine whether ANCs are eligible for the CARES Act funding set aside by the Treasury Department.

## II

All but one of the respondent Tribes agree that ANCs are eligible to receive the CARES Act funds in question if they are Indian tribes for purposes of ISDA.[3] The primary question for the Court, then, is whether ANCs satisfy ISDA's definition of "Indian tribe." The ANCs ask the Court to answer that question by looking to the definition's plain meaning. Respondents ask the Court to adopt a term-of-art construction that equates being "recognized as eligible for the special programs and services provided by the United States to Indians" with being a "federally recognized tribe," *i.e.*, a tribe recognized by the United States in a sovereign political sense.

_____

[3] The Court addresses the arguments of that one Tribe in Part III, *infra*.

A

Starting with the plain meaning, an "Indian tribe" under ISDA is a "tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to [ANCSA], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U. S. C. §5304(e). The definition's first two clauses are straightforward enough. The first lists entities that might count as Indian tribes under the Act (*e.g.*, tribes, bands, nations). The second, "the Alaska clause," makes clear that Alaska Native villages and ANCs are "includ[ed]." The third, "the recognized-as-eligible clause," requires more analysis. According to that clause, the listed entities must be "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."

ANCs, of course, are "established pursuant to" ANCSA within the meaning of the Alaska clause. They are thereby "recognized as eligible" for ANCSA's benefits. The trickier question is whether eligibility for the benefits of ANCSA counts as eligibility for "the special programs and services provided by the United States to Indians because of their status as Indians."

It does. Contrary to the dissent's view, *post*, at 9–10 (opinion of GORSUCH, J.), ANCSA is readily described as a special program provided by the United States to "Indians" (in this case, Alaska Natives). See 43 U. S. C. §1626 (describing ANCSA's relationship to "other programs"). The scope of that program is substantial: ANCSA made ANCs eligible to select tens of millions of acres of land and receive hundreds of millions of tax-exempt dollars. §§1605, 1610, 1611. Not just a one-time payment, ANCSA provides for revenue sharing among the regional ANCs to ensure Alaska Natives across the State benefit from an ongoing equitable

distribution of ANC profits. §1606(i). ANCSA further entrusts ANCs to "hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf" of Alaska Natives, who are the ANCs' shareholders, as well as to distribute dividends to them. See §§1602(j), 1606(j). Moreover, ANCs and their shareholders are "eligible for the benefits of" ANCSA, §1606(d), precisely because of their status as Indians. See §1626(e)(1) ("For all purposes of Federal law, a Native Corporation shall be considered to be a corporation owned and controlled by Natives"); note following §1601, p. 1136 (ANCSA is "'Indian legislation enacted by Congress pursuant to its plenary authority under the Constitution of the United States to regulate Indian affairs'").

Respondents do not deny that the benefits of ANCSA are "a" special program or service provided by the United States to Indians. According to respondents, however, such benefits are not "the" special programs and services provided to Indians (*e.g.*, healthcare, education, and other social services provided by federal agencies like the Bureau of Indian Affairs and the Indian Health Service). "The" special programs and services, respondents assert, are available only to federally recognized tribes (or, more precisely, to members of such tribes). In respondents' view, ANCs are thus "includ[ed]" in the "Indian tribe" definition's Alaska clause only to be excluded en masse from that definition by the recognized-as-eligible clause.

That would certainly be an odd result. Fortunately, the text does not produce it. ISDA's "Indian tribe" definition does not specify the particular programs and services an entity must be eligible for to satisfy the recognized-as-eligible clause. Given that ANCSA is the only statute the "Indian tribe" definition mentions by name, the best reading of the definition is that being eligible for ANCSA's benefits by itself satisfies the recognized-as-eligible clause.

Consider a similarly worded example.  A doctor recommends getting a blood test every six months to "any child, adult, or senior, including anyone over the age of 75 whose blood-sugar levels have tested in the prediabetic range within the last five years, who exhibits the warning signs of Type 2 diabetes."  Without further context, it is unclear exactly which warning signs the doctor is referring to, or how many of those signs a child, adult, or senior must exhibit before warranting biannual testing.  But it is fair to say that individuals over 75 with prediabetic blood-sugar levels within the last five years should get tested biannually, even if they exhibit no other warning signs.  By expressly "including" individuals with that one warning sign, the doctor's recommendation makes clear that particular sign, by itself, is warning enough.

Just so here: Congress' express inclusion of ANCs "established pursuant to [ANCSA]" confirms that eligibility for ANCSA's benefits alone is eligibility enough to be an Indian tribe.  ANCs thus satisfy ISDA's Indian tribe definition, regardless of whether they and their shareholders are eligible for federal Indian programs and services other than those provided in ANCSA.  At any rate, the one-to-one relationship respondents posit between membership in a federally recognized tribe and eligibility for federal Indian benefits more broadly does not hold in the unique circumstances of Alaska.  See Letter from E. Prelogar, Acting Solicitor General, to S. Harris, Clerk of Court (Apr. 22, 2021) ("[T]he federal government has historically provided benefits and services to Alaska Natives who are not enrolled members of a federally recognized Indian tribe"); D. Case & D. Voluck, Alaska Natives and Americans Laws 30 (3d ed. 2012) ("[T]he federal government has, at least since the end of the nineteenth century, provided a wide variety of programs and services to Alaska Natives solely because of their status as Natives").  So ANCSA is not, in fact, the only federal In-

dian program or service for which ANCs and their shareholders are eligible.

It should come as no surprise that Congress made ANCs eligible to contract under ISDA. After all, Congress itself created ANCs just four years earlier to receive the benefits of the Alaska land settlement on behalf of all Alaska Natives. Allowing ANCs to distribute federal Indian benefits more broadly is entirely consistent with the approach Congress charted in ANCSA. Accord, 1 American Indian Policy Review Comm'n, Final Report, 95th Cong., 1st Sess., 495 (Comm. Print 1977) (ANCs "might well be the form or organization best suited to sponsor certain kinds of federally funded programs" in Alaska); 43 U. S. C. §1606(r) ("The authority of a Native Corporation to provide benefits . . . to promote the health, education, or welfare of . . . shareholders or family members is expressly authorized and confirmed").

Under the plain meaning of ISDA, ANCs are Indian tribes, regardless of whether they are also federally recognized tribes. In so holding, the Court does not open the door to other Indian groups that have not been federally recognized becoming Indian tribes under ISDA. Even if such groups qualify for certain federal benefits, that does not make them similarly situated to ANCs. ANCs are *sui generis* entities created by federal statute and granted an enormous amount of special federal benefits as part of a legislative experiment tailored to the unique circumstances of Alaska and recreated nowhere else. Moreover, with the exception of Alaska Native villages (which are now federally recognized), no entities other than ANCs are expressly "includ[ed]" by name in ISDA's "Indian tribe" definition. Cf. *Sturgeon*, 577 U. S., at 440 ("All those Alaska-specific provisions reflect the simple truth that Alaska is often the exception, not the rule").

B

Respondents urge this Court to discard the plain meaning of the "Indian tribe" definition in favor of a term-of-art construction. In respondents' view, the 69 words of the "Indian tribe" definition are a long way of saying just 8: An "Indian tribe" means a "federally recognized tribe." If that is right, respondents are correct that ANCs are not Indian tribes, because everyone agrees they are not federally recognized tribes. To prevail on this argument, however, respondents must demonstrate that the statutory context supports reading ISDA's "Indian tribe" definition as a term of art rather than according to its plain meaning. See *Johnson* v. *United States*, 559 U. S. 133, 139 (2010). Their efforts are not persuasive.

In arguing for a term-of-art construction, respondents first rely on a series of Acts that terminated various tribes starting in the late 1950s. Those Acts closed tribal membership rolls, specified the division of tribal assets, and revoked tribal constitutions. See, *e.g.*, Act of Sept. 21, 1959, Pub. L. No. 86–322, 73 Stat. 592. Following termination, the tribe and its members were no longer "entitled to any of the special services performed by the United States for Indians because of their status as Indians." §5, *id.,* at 593. As respondents note, this language resembles (although does not mirror precisely) the final words of ISDA's recognized-as-eligible clause. If being terminated means no longer being "entitled to any of the special services performed by the United States for Indians because of their status as Indians," the argument goes, then being "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians" means being a federally recognized tribe.

Respondents misjudge the relevance of these termination statutes. Those statutes do not contain the words "recognized as eligible"; they do not even contain the word "recognized." Furthermore, the termination statutes use their

ISDA-reminiscent phrasing not as a synonym for termination but to describe just one, among other, consequences of a tribe's constitution being revoked. See, *e.g., ibid.* ("The constitution of the tribe . . . shall be revoked by the Secretary. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction").

Some linguistic similarity between ISDA and the termination statutes does not suggest that the language of the recognized-as-eligible clause was an accepted way of saying "a federally recognized tribe" in 1975. It instead supports a much more limited proposition: A federally recognized tribe that has not been terminated is "entitled" to "special services performed by the United States for Indians," and thereby satisfies ISDA's similarly worded recognized-as-eligible clause. But of course, no one disputes that being a federally recognized tribe is one way to qualify as an Indian tribe under ISDA; it is just not the only way.

Nor is the mere inclusion of the word "recognized" enough to give the recognized-as-eligible clause a term-of-art meaning. True, the word "recognized" often refers to a tribe with which the United States has a government-to-government relationship (particularly when it is sandwiched between the words "federally" and "tribe"). That does not mean, however, that the word "recognized" always connotes political recognition.[4]

--------

[4] Indeed, "recognition" is not even the sole term used to describe tribes with which the United States maintains a government-to-government relationship; "acknowledgement" is often used for that same purpose. See 1 F. Cohen, Handbook of Federal Indian Law §3.02[3] (N. Newton ed. 2012) ("Federal acknowledgement or recognition of an Indian group's

"Recognized" is too common and context dependent a word to bear so loaded a meaning wherever it appears, even in laws concerning Native Americans and Alaska Natives. Cf. *Bruesewitz* v. *Wyeth LLC*, 562 U. S. 223, 235 (2011) (declining to read "unavoidable" as a term of art in part because "'[u]navoidable' is hardly a rarely used word"). Certainly, "recognized" can signify political recognition; it can also refer to something far more pedestrian. See, *e.g.*, Black's Law Dictionary 1436 (rev. 4th ed. 1968) (defining "recognition" as "[r]atification; confirmation; an acknowledgment that something done by another person in one's name had one's authority"). The type of recognition required is a question best answered in context. See, *e.g.*, 25 U. S. C. §3002(a)(2)(C)(1) (providing for control over certain cultural items "in the Indian tribe that is recognized as aboriginally occupying the area in which the objects were discovered"); §4352(3) (defining a "Native Hawaiian organization" as a nonprofit that, among other things, "is recognized for having expertise in Native Hawaiian culture and heritage, including tourism"). In ISDA, the required recognition is of an entity's eligibility for federal Indian programs and services, not a government-to-government relationship with the United States.[5]

———————

legal status as a tribe is a formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government"). For instance, in 1978, three years after ISDA's enactment, the Bureau of Indian Affairs adopted "procedures for acknowledging that certain American Indian tribes exist." 43 Fed. Reg. 39361 (1978). To this day, applications to become a federally recognized tribe are made to the Office of Federal Acknowledgement, and the Interior Department still uses "recognized" and "acknowledged" somewhat interchangeably. See, *e.g.,* 86 Fed. Reg. 7554 (2021) ("Published below is an updated list of federally acknowledged Indian Tribes").

[5] The dissent reads the congressional findings to ISDA as providing a textual clue that government-to-government recognition is required. See *post,* at 7 (opinion of GORSUCH, J.) ("When Congress passed ISDA, it sought to provide Indians 'meaningful leadership roles' that are 'crucial

Respondents next rely on sources that postdate ISDA. Ordinarily, however, this Court reads statutory language as a term of art only when the language was used in that way at the time of the statute's adoption. See *Food Marketing Institute* v. *Argus Leader Media*, 588 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 10) (rejecting a term-of-art reading where the parties "mustered no evidence that the terms of" the statute carried a "specialized common law meaning . . . at the time of their adoption"). In relying on sources postdating ISDA, respondents must show not only that the language of the recognized-as-eligible clause later became a term of art, but also that this term-of-art understanding should be backdated to ISDA's passage in 1975. They cannot make that showing.

Respondents lean most heavily on the Federally Recognized Indian Tribe List Act of 1994 (List Act), enacted almost 20 years after ISDA. See 25 U. S. C. §§5130, 5131. The List Act requires the Secretary of the Interior to publish an annual list of "all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." §5131(a). According to respondents, ANCs' absence from the Secretary's list confirms that they are not "eligible for the special programs and services provided by the United States to Indians because of their

_____

to the realization of self-government'" (citing 25 U. S. C. §5301)). As already explained, however, *supra,* at 10–11, allowing ANCs to contract under ISDA, notwithstanding their lack of political recognition, is entirely consistent with that statute's stated objective of "establish[ing] . . . a meaningful Indian self-determination policy." §5301(b). Congress also designed ANCSA to be "in conformity with the real economic and social needs of Natives" and to facilitate "maximum participation by Natives in decisions affecting their rights and property." 43 U. S. C. §1601(b). ANCs are the vehicles Congress created to further that policy of self-determination. Accord, S. Conf. Rep. No. 92–581, p. 37 (1971) ("[T]he creation of Regional and Village Corporations" are part of "a policy of self-determination on the part of the Alaska Native people").

status as Indians," §5304(e), and thus fail ISDA's recognized-as-eligible clause.

Respondents' cross-referencing argument, however, requires the Court to ignore the reason why ANCs are not on the list. True to its full name, the Federally Recognized Indian Tribe List Act tasks the Secretary with maintaining a "'list of federally recognized tribes'" only. Note following §5130, p. 678. The List Act, moreover, lacks language like that in ISDA expressly "including" ANCs "established pursuant to" ANCSA. §5304(e). The obvious inference, then, is that ANCs are not on the Secretary's list simply because they are not federally recognized.

History confirms as much. In 1979, 15 years before the List Act was passed, the Secretary began publishing a list of Indian tribes "that have a government-to-government relationship with the United States." 44 Fed. Reg. 7235. In 1988, ANCs were added to the Secretary's list, which had been retitled "Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs," because ANCs are "specifically eligible for the funding and services of the [Bureau of Indian Affairs] by statute" and "should not have to undertake to obtain Federal Acknowledgement" (*i.e.*, federal recognition). 53 Fed. Reg. 52829, 52832. In 1993, the Secretary dropped ANCs from the list, concluding that "the inclusion of ANC[s], which lack tribal status in a political sense, called into question the status" of the other entities on the list. 58 Fed. Reg. 54365. In so doing, the Secretary reaffirmed that ANCs "are not governments, but they have been designated as 'tribes' for the purposes of some Federal laws," including ISDA. *Id.*, at 54364. The List Act, passed the following year, "confirmed the Secretary's authority and responsibility" to maintain a list of federally recognized tribes. 60 Fed. Reg. 9251. Hence, ANCs remained off the list.

To accept respondents' argument, then, the Court would need to cross-reference ISDA's definition of an "Indian

tribe" with the Secretary's list, but ignore why ANCs were excluded from that list in the first place. The Court declines to take that doubtful step.

Despite asking the Court to consider post-ISDA statutes to determine whether ANCs are "Indian tribes" under ISDA, moreover, respondents largely fail to address post-ISDA congressional actions that contradict their position. First, consider Congress' treatment of the Cook Inlet Region, Inc. (CIRI), the regional ANC for the ANCSA region covering more than half the Alaskan population. See The Twelve Regions, ANCSA Regional Association (June 1, 2021), https://ancsaregional.com/the-twelve-regions. In 1994, CIRI contracted under ISDA through its designated healthcare provider to offer healthcare benefits to Alaska Natives and American Indians in Anchorage and the Matanuska-Susitna Valley. See *Cook Inlet Treaty Tribes* v. *Shalala*, 166 F. 3d 986, 988 (CA9 1999). A group of Alaska Native villages sued, arguing that the Federal Government should have first obtained their approval. *Ibid.*; see 25 U. S. C. §5304(*l*) ("[I]n any case where [an ISDA contract] benefit[s] more than one Indian tribe, the approval of each such Indian tribe" is required). Congress mooted the dispute by passing a bill that waived ISDA's normal tribal approval requirement for CIRI's healthcare contracts. Department of the Interior and Related Agencies Appropriations Act, 1998, §325(a), 111 Stat. 1597–1598. In so doing, Congress not only assumed CIRI was eligible to enter into ISDA contracts (notwithstanding its lack of federal recognition), but actively cleared the way for it to do so.

Next, consider the Native American Housing Assistance and Self-Determination Act of 1996 (NAHASDA), 25 U. S. C. §4101 *et seq.*, which incorporates ISDA's "Indian tribe" definition, see §4103(13)(B). NAHASDA creates a housing block grant program for Indian tribes. §4111. The regional ANCs (acting through their designated housing authorities) are among the largest recipients of these

grants in Alaska, receiving tens of millions of dollars each year. See Dept. of Housing and Urban Development, FY 2020 Final [Indian Housing Block Grant] Funding by [Tribally Designated Housing Entities] & Regions. For years, Congress has passed appropriations riders requiring that the existing recipients of NAHASDA's housing block grants in Alaska (including ANCs) continue to receive those grants. See, *e.g.*, Further Consolidated Appropriations Act, 2020, Pub. L. 116–94, Div. H, Tit. II, §211, 133 Stat. 3003. Following the D. C. Circuit's decision in this case, Congress awarded additional grants under NAHASDA and emphasized that, "[f]or the avoidance of doubt," the "Indian tribe[s]" eligible for those grants "shall include Alaska native corporations established pursuant to" ANCSA. Consolidated Appropriations Act, 2021, Pub. L. 116–260, Div. N, Tit. V, Subtit. A, §501(k)(2)(C), 134 Stat. 2077.

Thus, post-ISDA sources prove no more fruitful to respondents than pre-ISDA ones. Even assuming the Court should look to events after 1975, respondents cannot cherry-pick statutes like the List Act without explaining postenactment developments that undermine their interpretation. In the end, the various statutes cited do not support respondents' efforts to exclude ANCs from ISDA by use of a term-of-art construction.[6]

C

Even if ANCs did not satisfy the recognized-as-eligible clause, however, they would still satisfy ISDA's definition of an "Indian tribe." If respondents were correct that only a federally recognized tribe can satisfy that clause, then the best way to read the "Indian tribe" definition as a whole would be for the recognized-as-eligible clause not to apply to the entities in the Alaska clause at all (*i.e.*, to "any Alaska

_____

[6] In so holding, the Court does not decide whether the language of the recognized-as-eligible clause has been used as a term of art in other statutes subsequent to ISDA's enactment.

Native village or regional or village corporation," 25 U. S. C. §5304(e)). On this reading, the way to tell whether a tribe, band, nation, or other organized group or community is an "Indian tribe" is to ask whether it is federally recognized, but the way to tell whether an Alaska Native village or corporation is an "Indian tribe" is to ask whether it is "defined in or established pursuant to" ANCSA. *Ibid.* Otherwise, despite being prominently "includ[ed]" in the "Indian tribe" definition, *ibid.*, all ANCs would be excluded by a federal-recognition requirement there is no reasonable prospect they could ever satisfy.

Respondents object (and the dissent agrees) that this construction "produces grammatical incoherence." Brief for Respondents Confederated Tribes of Chehalis Reservation et al. 16; *post*, at 4–5. They point out that a modifying clause at the end of a list (like the recognized-as-eligible clause) often applies to every item in the list. See, *e.g.*, *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4 (2005). The so-called series-qualifier canon can be a helpful interpretive tool, and it supports the idea that the recognized-as-eligible clause applies to every type of entity listed in the "Indian tribe" definition, including ANCs. Given that the entities in the Alaska clause are the closest in proximity to the recognized-as-eligible clause, that canon arguably applies with particular force here.

As the Court reiterated earlier this Term, however, the series-qualifier canon gives way when it would yield a "contextually implausible outcome." *Facebook, Inc.* v. *Duguid*, 592 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 9); see also *id.*, at \_\_\_ (ALITO, J., concurring in judgment) (slip op., at 1) (noting that "[c]anons are useful tools, but it is important to keep their limitations in mind. This may be especially true with respect to . . . the 'series-qualifier' canon"). The most grammatical reading of a sentence in a vacuum does not always produce the best reading in context. See, *e.g.*, *Sturgeon*, 577 U. S., at 438 ("Statutory language 'cannot be construed in a

vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme'"); cf. B. Garner, Modern English Usage 784 (4th ed. 2016) (noting the "increasingly common" "'remote relative,'" *i.e.*, the practice of separating "the relative pronoun (*that*, *which*, *who*) from its antecedent").

Consider an example with the same syntax as the "Indian tribe" definition.  A restaurant advertises "50% off any meat, vegetable, or seafood dish, including ceviche, which is cooked."  Say a customer orders ceviche, a Peruvian specialty of raw fish marinated in citrus juice.  Would she expect it to be cooked?  No.  Would she expect to pay full price for it?  Again, no.  Under the reading recommended by the series-qualifier canon, however, the ceviche was a red herring.  Even though the 50%-off sale specifically named ceviche (and no other dish), it costs full price because it is not cooked.  That conclusion would make no sense to a reasonable customer.

Like applying a "cooked" requirement to ceviche, applying a "federally recognized" requirement to ANCs is implausible in context.  When Congress enacted ISDA in 1975, not a single Alaska Native village or ANC had been recognized for a government-to-government relationship with the United States.  On respondents' reading, then, the entire Alaska clause originally had no effect.  None of its entities qualified as Indian tribes for purposes of ISDA, even though the only entities expressly included in ISDA's definition of an "Indian tribe" are those in the Alaska clause.

The only explanation respondents offer for this highly counterintuitive result is that Congress included Alaska Native villages and corporations in the "Indian tribe" definition on the possibility they might one day become federally recognized.  That is highly unlikely.  First, the Alaska clause would be redundant on that account.  See Brief for Respondents Confederated Tribes of Chehalis Reservation

et al. 31 ([T]he Alaska [clause] is . . . best read as redundant"). A federally recognized Alaska Native village or ANC would presumably already fit into one of the pre-existing ISDA categories of "tribe[s], band[s], nation[s], or other organized group[s] or communit[ies]." 25 U. S. C. §5304(e).

Second, it is quite doubtful that anyone in 1975 thought the United States was going to recognize ANCs as sovereign political entities. ANCs are for-profit companies incorporated under state law that Congress itself created just four years prior to ISDA. They are not at all the type of entities normally considered for a government-to-government relationship with the United States. Accord, 25 CFR §83.4 (1994) ("The Department will not acknowledge," *i.e.*, federally recognize, "[a]n association, organization, corporation, or entity of any character formed in recent times unless the entity has only changed form by recently incorporating or otherwise formalizing its existing politically autonomous community"). Indeed, at the time ISDA was enacted, some doubted whether even Alaska Native villages could be federally recognized.[7]

Respondents counter by pointing to certain organizations created in Alaska in the 1930s that later became federally recognized tribes. One such organization, the Hydaburg Cooperative Association (HCA), was formed under the 1936 Amendment to the Indian Reorganization Act, which authorized Alaska Natives groups "not heretofore recognized as bands or tribes" to organize based on "a common bond of occupation, or association, or residence." Ch. 254, 49 Stat. 1250 (codified at 25 U. S. C. §5119). The HCA organized around "a common bond of occupation in the fish industry." Constitution and By-Laws of the Hydaburg Cooperative As-

———————

[7] That doubt was resolved in the villages' favor in 1993. See 58 Fed. Reg. 54365.

sociation, Alaska Preamble (1938).  Decades later, the Interior Department acknowledged the HCA as a federally recognized tribe, even though it is of fairly recent vintage and organized around a bond of occupation rather than solely around an ancestral tribal heritage.  See 58 Fed. Reg. 54369.  If the HCA could be federally recognized, respondents say, some might have thought ANCs could too.

Respondents make too much of the HCA and the small handful of entities like it, which are not comparable to ANCs.  Unlike ANCs, the former entities were organized under federally approved constitutions as part of a short-lived attempt to recreate in Alaska a tribal reservation system like that in the lower 48 States.  ANCs, by contrast, were incorporated under state law pursuant to legislation that embodied the formal repudiation of that approach. That the Interior Department deemed the HCA and a handful of other entities like it federally recognized tribes decades after ISDA's passage does not mean it was plausible in 1975 to think ANCs would one day become federally recognized tribes, as well.[8]

Ultimately, respondents resort to the argument that, although the idea of ANCs becoming federally recognized tribes might be farfetched, it is not technically impossible. That is, Congress' plenary power over Indian affairs could

───────────

[8] Respondents also point to a 1996 bill that would have "deemed" one regional ANC, CIRI, "an Indian tribal entity for the purpose of federal programs for which Indians are eligible because of their status as Indians" and would have mandated that CIRI be "specifically include[d]" "on any list that designates federally recognized Indian tribes."  H. R. 3662, 104th Cong., 2d Sess., §§121(a)–(b) (1996).  By its terms, the bill would not have entered CIRI into a government-to-government relationship with the United States; it merely would have made CIRI eligible for all federal Indian programs available to federally recognized tribes.  In any event, it is hard to make too much of a failed bill.  See *United States* v. *Craft*, 535 U. S. 274, 287 (2002) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute" (internal quotation marks omitted)).

conceivably permit it to recognize a government-to-government relationship between an ANC and the United States. Perhaps, but possibility is not the same as plausibility, and both are proper concerns of statutory interpretation. Consider again the example of a restaurant advertising "50% off any meat, vegetable, or seafood dish, including ceviche, which is cooked." On respondents' logic, because the restaurant technically could cook its ceviche, the only way to read the advertisement is that ceviche is full price unless the restaurant takes an unexpected culinary step.

That is wrong. The best reading of the advertisement is that ceviche is 50% off even if it is not cooked, just as the best reading of ISDA is that ANCs are Indian tribes even if they are not federally recognized. Any grammatical awkwardness involved in the recognized-as-eligible clause skipping over the Alaska clause pales in comparison to the incongruity of forever excluding all ANCs from an "Indian tribe" definition whose most prominent feature is that it specifically includes them.

### D

Respondents make a few final arguments to persuade the Court that ANCs are not Indian tribes under ISDA. None succeeds.

Respondents argue first that the ANCs misrepresent how meaningful a role they play under ISDA because the actual number of ISDA contracts held by ANCs is negligible. The Court does not have the record before it to determine the exact number and nature of ISDA contracts held by ANCs or their designees, either historically or currently. The point is largely irrelevant, however. No one would argue that a federally recognized tribe was not an Indian tribe under ISDA just because it had never entered into an ISDA contract. The same is true for ANCs. To the extent respondents argue that ruling for them would be of little practical consequence given the small number of ISDA contracts

held by ANCs, quantity is not the only issue. For example, CIRI contracts through a designee to provide healthcare to thousands of Alaska Natives in Anchorage and the Matanuska-Susitna Valley. Brief for CIRI as *Amicus Curiae* 9. The loss of CIRI's ability alone to contract under ISDA would have significant effects on the many Alaska Natives it currently serves.[9]

Respondents further argue that treating ANCs as Indian tribes would complicate the administration of ISDA. If an ISDA contract will benefit multiple Indian tribes, each such tribe has to agree to the contract before it can go into effect. 25 U. S. C. §5304(*l*). Because membership in ANCs and federally recognized tribes often overlap, respondents argue that ANCs will be able to veto any ISDA contract sought by a federally recognized tribe in Alaska.

Without discounting the possibility of administrative burdens, this concern is overstated. The Executive Branch has treated ANCs as Indian tribes for 45 years, yet respondents point to no evidence of such a problem ever having arisen. If such a problem does arise, moreover, the Interior Department may be able to craft an administrative solution. Cf. 46 Fed. Reg. 27178, 27179 (1981) (Indian Health Service regulations establishing an "order of precedence" among Alaskan entities "[f]or the purposes of contracting

---

[9] Respondents argue that CIRI's healthcare services would survive a ruling in respondents' favor, because CIRI's ISDA contract is provided for "by separate statute." Brief for Respondents Confederated Tribes of Chehalis Reservation et al. 52. As discussed, after CIRI entered into an ISDA contract to provide healthcare benefits, a group of Alaskan tribes sued. See *Cook Inlet Treaty Tribes* v. *Shalala*, 166 F. 3d 986, 988 (CA9 1999). Congress then passed a bill to moot the dispute. Department of the Interior and Related Agencies Appropriations Act, 1998, §325(a), 111 Stat. 1597–1598. It is not entirely clear whether this bill means that CIRI's ISDA contract would survive a ruling that ANCs are not Indian tribes under ISDA. But the fact that Congress intervened to ensure that a regional ANC could more easily contract under ISDA is, if anything, further indication that the Court's ruling today is the correct one.

under" ISDA and requiring authorizing resolutions from "[v]illages, as the smallest tribal units under" ANCSA).

Respondents also warn that blessing ANCs' status under ISDA will give them ammunition to press for participation in the many statutes besides the CARES Act that incorporate ISDA's "Indian tribe" definition. See, *e.g.*, Indian Health Care Improvement Act, §4(d), 90 Stat. 1401; Native American Housing Assistance and Self-Determination Act of 1996, §4(12)(B), 110 Stat. 4019–4020; Indian Tribal Energy Development and Self-Determination Act of 2005, [Title V of the Energy Policy Act of 2005], §503(a), 119 Stat. 764–765.

As the Government notes, however, there may well be statutes that incorporate ISDA's "Indian tribe" definition but exclude ANCs from participation in other ways. See Brief for Federal Petitioner 33–34 (citing, *e.g.*, 7 U. S. C. §§1639o(2), 1639p(a)(1) (defining "Indian tribe" to incorporate the ISDA definition, but also requiring participants to exercise "'regulatory authority over . . . territory of the Indian tribe'")). Moreover, this concern cuts both ways. If respondents' reading prevailed, ANCs would presumably be excluded from all other statutes incorporating ISDA's definition, even those under which ANCs have long benefited. That includes the Indian Tribal Energy Development and Self-Determination Act of 2005, under which ANCs have received millions of dollars of energy assistance. See Brief for Federal Petitioner 33. That also includes NAHASDA, which, as discussed, creates a housing block grant program under which the regional ANCs are some of the biggest recipients in Alaska. See *supra*, at 17–18. Currently, over 10,000 Alaskans live in housing units built, improved, or managed by these regional authorities. See Brief for Association of Alaska Housing Authorities as *Amicus Curiae* 15.

All told, the Court's decision today does not "vest ANCs with new and untold tribal powers," as respondents fear.

Brief for Respondents Confederated Tribes of Chehalis Reservation et al. 54. It merely confirms the powers Congress expressly afforded ANCs and that the Executive Branch has long understood ANCs to possess.

## III

Almost everyone agrees that if ANCs are Indian tribes under ISDA, they are eligible for funding under Title V of the CARES Act. If Congress did not want to make ANCs eligible for CARES Act funding, its decision to incorporate ISDA's "Indian tribe" definition into the CARES Act would be inexplicable. Had Congress wished to limit CARES Act funding to federally recognized tribes, it could simply have cross-referenced the List Act instead, as it had in numerous statutes before.[10] Instead, Congress invoked a definition that expressly includes ANCs (and has been understood for decades to include them). Today's ruling merely gives effect to that decision.

Nevertheless, the Ute Indian Tribe of the Uintah and Ouray Reservation argues that the CARES Act excludes ANCs regardless of whether they are Indian tribes under ISDA. Recall that the CARES Act allocates money to "Tribal governments." 42 U. S. C. §801(a)(2)(B). A "Tribal government" is "the recognized governing body of an Indian tribe." §801(g)(5). According to the Utes, ANCs do not have a "recognized governing body" because that term applies to the governing body of a federally recognized tribe alone.

As the Utes implicitly acknowledge, however, federal recognition is usually discussed in relation to tribes, not their governing bodies. Brief for Respondent Ute Indian

---

[10] See, *e.g.,* Indian Arts and Crafts Amendments Act of 2010, §203(a)(2), 124 Stat. 2263 ("The term 'Indian tribe' has the meaning given the term in section 102 of the Federally Recognized Indian Tribe List Act of 1994"); Helping Expedite and Advance Responsible Tribal Home Ownership Act of 2012, §2, 126 Stat. 1150 (same); Deadbeat Parents Punishment Act of 1998, §2, 112 Stat. 619 (same).

Tribe of the Uintah and Ouray Reservation 13 ("The recognized relationship is a political relationship between the United States and the tribe"); see also, *e.g.*, note following 25 U. S. C. §5130, p. 678 ("'[T]he United States has a trust responsibility to recognized Indian tribes, maintains a government-to-government relationship with those tribes, and recognizes the sovereignty of those tribes'"). In addition, the CARES Act's use of the term "recognized governing body" is borrowed from ISDA itself, which lists the "recognized governing body" of an Indian tribe as one type of "tribal organization" empowered to contract with the government on the tribe's behalf. §5304(*l*). In the ISDA context, this term has long been understood to apply to an ANC's board of directors, the ANC's governing body as a matter of corporate law. See, *e.g.*, App. 45 (An ANC's "board of directors . . . is its 'governing body'"); see also Black's Law Dictionary, at 219 (defining "Board of Directors" as "[t]he governing body of a private corporation"). Indeed, respondents do not dispute that the plain meaning of "recognized governing body" covers an ANC's board of directors.[11]

Looking to the plain meaning of "recognized governing body" makes even more sense because nothing in either the CARES Act or ISDA suggests that the term "recognized governing body" places additional limits on the kinds of Indian tribes eligible to benefit under the statutes. In both laws, the term instead pinpoints the particular entity that will receive funding on behalf of an Indian tribe. See 42 U. S. C. §801(g)(5); 25 U. S. C. §5304(*l*). Because ANCs are Indian tribes within the meaning of the CARES Act, an ANC's board of directors is a "recognized governing body" eligible to receive funding under Title V of the Act.

_____

[11] The Utes rely also on *Seldovia Native Assn., Inc.* v. *Lujan*, 904 F. 2d 1335 (CA9 1990). *Seldovia* never discussed the term "recognized governing body" and concerned whether ANCs are Indian tribes for purposes of Circuit precedent construing the Eleventh Amendment. *Id.,* at 1350.

## IV

The Court today affirms what the Federal Government has maintained for almost half a century: ANCs are Indian tribes under ISDA.  For that reason, they are Indian tribes under the CARES Act and eligible for Title V funding.  The judgment of the Court of Appeals for the District of Columbia Circuit is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

## Nos. 20–543 and 20–544

_____

JANET L. YELLEN, SECRETARY OF THE
TREASURY, PETITIONER
20–543                    *v.*
CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION, ET AL.


ALASKA NATIVE VILLAGE CORPORATION
ASSOCIATION, INC., ET AL., PETITIONERS
20–544                    *v.*
CONFEDERATED TRIBES OF THE CHEHALIS
RESERVATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 25, 2021]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and
JUSTICE KAGAN join, dissenting.

The Coronavirus Aid, Relief, and Economic Security Act
(CARES Act) directed trillions of dollars to various recipi-
ents across the Nation to help them address the COVID–19
pandemic. Our case focuses on $8 billion Congress set aside
for "Tribal governments." The question we must answer is
whether Alaska's for-profit Alaska Native Corporations
(ANCs) qualify as "Tribal governments." If they do, they
may receive approximately $450 million of the earmarked
funds; if not, the money will go to tribes across the country.
The Court of Appeals for the District of Columbia Circuit
wrote a thoughtful and unanimous opinion holding that
ANCs are not "Tribal governments." Today, the Court dis-

agrees, providing two competing theories for its result.  Respectfully, I find neither persuasive and would affirm.

I

The Alaska Native Claims Settlement Act of 1971 (ANCSA) sought to "settle all land claims by Alaska Natives" by "transfer[ring] $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations" in which Alaska Natives were given shares.  *Alaska* v. *Native Village of Venetie Tribal Government*, 522 U. S. 520, 523–524 (1998); 43 U. S. C. §1601 *et seq.*  In particular, ANCSA established over 200 "Village Corporations" and 12 "Regional Corporations."  §§1602, 1606.  The Village Corporations were created to hold and manage "lands, property, funds, and other rights and assets for and on behalf of a Native village." §1602(j).  Meanwhile, shares in the Regional Corporations went to individuals across many different tribes and villages.  §§1604, 1606(g)(1)(A).  These corporations received most of the settlement funds and lands Congress provided, assets they use to "conduct business for profit." §§1606(d), 1610–1613; see also Brief for Federal Petitioner 5.  Today, ANCs are involved in oil and gas, mining, military contracting, real estate, construction, communications and media, engineering, plastics, timber, and aerospace manufacturing, among other things.  GAO, Report to Congressional Requesters, Regional Alaska Native Corporations: Status 40 Years After Establishment, and Future Considerations (GAO–13–121, Dec. 2012).  "In fiscal year 2017, ANCs had a combined net revenue of $9.1 billion." *Confederated Tribes of Chehalis Reservation* v. *Mnuchin*, 456 F. Supp. 3d 152, 157 (DC 2020).

Everyone agrees that ANCs are entitled to *some* CARES Act relief.  Already, they have received benefits Congress allocated to corporations, like the Paycheck Protection Program.  See Brief for Respondent Ute Indian Tribe of Uintah

and Ouray Reservation 1 (Brief for Respondent Ute Tribe). Congress also accounted for ANC shareholders, and all Alaskans, when it directed over $2 billion to the State. In fact, Alaska received more money per capita than all but two other States. *Id.*, at 3; Congressional Research Service, General State and Local Fiscal Assistance and COVID–19: Background and Available Data (Feb. 8, 2021). The Alaska Native Villages received hundreds of millions of those dollars because everyone agrees they qualify as tribal governments for purposes of the CARES Act. See *ibid.* This suit concerns only the ANCs' claim of entitlement to *additional* funds statutorily reserved for "Tribal governments." 42 U. S. C. §801(a)(2)(B). If that counterintuitive proposition holds true, ANCs will receive approximately $450 million that would otherwise find its way to recognized tribal governments across the country, including Alaska's several hundred Native Villages. See Letter from E. Prelogar, Acting Solicitor General, to S. Harris, Clerk of Court (May 12, 2021).

In the CARES Act, Congress defined a "Tribal government" as the "recognized governing body of an Indian Tribe." §801(g)(5). In turn, Congress specified in §801(g)(1) that the term "Indian Tribe" should carry here the same meaning that it bears in the Indian Self-Determination and Education Assistance Act of 1975 (ISDA). The relevant portion of that statute provides as follows:

> "'Indian tribe' [or 'Indian Tribe'] means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U. S. C. 1601 et. seq.], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U. S. C. §5304(e).

The question before us thus becomes whether ANCs count as "Indian tribes" under the longstanding terms Congress adopted in ISDA almost 50 years ago. To resolve that dispositive question, we must answer two subsidiary ones: (1) Does the statute's final clause (call it the recognition clause) apply to the ANCs listed earlier? (2) If so, are ANCs "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians"? In my view, the recognition clause does apply to ANCs along with the other listed entities. And ANCs are not "recognized" as tribes eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

## II
### A

Start with the question whether the recognition clause applies to the ANCs. As the nearest referent and part of an integrated list of other modified terms, ANCs must be subject to its terms. Unsurprisingly, the Court of Appeals reached this conclusion unanimously. Lawyers often debate whether a clause at the end of a series modifies the entire list or only the last antecedent. *E.g., Lockhart* v. *United States*, 577 U. S. 347, 350–352 (2016); *id.*, at 362–369 (KAGAN, J., dissenting); *Facebook, Inc.* v. *Duguid*, 592 U. S. ___, ___–___ (2021) (slip op., at 5–7); *id.*, at ___–___ (ALITO, J., concurring in judgment) (slip op., at 1–4). In ISDA, for example, some might wonder whether the recognition clause applies *only* to ANCs or whether it *also* applies to the previously listed entities—"Indian tribe[s], band[s], nation[s]," etc. But it would be passing strange to suggest that the recognition clause applies to everything *except* the term immediately preceding it. A clause that leaps over its nearest referent to modify every other term would defy grammatical gravity and common sense alike. See, *e.g., Fa-*

*cebook, Inc.*, 592 U. S., at ___ (slip op., at 7); *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4 (2005).

Exempting ANCs from the recognition clause would be curious for at least two further reasons. First, the reference to ANCs comes after the word "including." No one disputes that the recognition clause modifies "any Indian tribe, band, nation, or other organized group or community." So if the ANCs are *included* within these previously listed nouns—as the statute says they are—it's hard to see how they might nonetheless evade the recognition clause. Second, in the proceedings below it was undisputed that the recognition clause modifies the term "Alaska Native village[s]," even as the ANCs argued that the clause does not modify the term "Alaska Native . . . regional or village corporation." *Confederated Tribes of Chehalis Reservation* v. *Mnuchin*, 976 F. 3d 15, 23 (CADC 2020); Brief for Federal Petitioner 46. But to believe that, one would have to suppose the recognition clause skips over only half its nearest antecedent. How the clause might do *that* mystifies. See *Facebook*, 592 U. S., at ___ (slip op., at 6) ("It would be odd to apply the modifier . . . to only a portion of this cohesive preceding clause").

At least initially, the Court accepts the obvious and concedes that the recognition clause modifies everything in the list that precedes it. *Ante,* at 8. But this leaves the Court in a bind. If the recognition clause applies to ANCs, then ANCs must be "recognized" in order to receive funds. And "recognition" is a formal concept in Indian law: "Federal acknowledgement or recognition of an Indian group's legal status as a tribe is a formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government." 1 F. Cohen, Handbook of Federal Indian Law §3.02[3], pp. 133–134 (N. Newton ed. 2012); see also *id.*, §3.02[2], at 132–133. No one

contends that ANCs are recognized by the federal government in this sense.

Admittedly, not every statutory use of the word "recognized" must carry the same meaning. See *ante*, at 14. But not only does ISDA arise in the field of Indian law where the term "recognition" has long carried a particular meaning. The statute proceeds to refer to groups that are "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." This full phrase is a mouthful, but it was a familiar one to Congress by the time it passed ISDA in 1975. In preceding decades, Congress used similar language in statute after statute granting and terminating formal federal recognition of certain tribes.[1] All of which strongly suggests that ISDA's recognition clause likewise refers to the sort of formal government-to-government recognition that triggers eligibility for the full "panoply of benefits and services" the federal government provides to

————————

[1] *E.g.,* Act of Sept. 21, 1959, §5, 73 Stat. 593 (upon termination, the former Tribe and its members "shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians"); Act of Aug. 23, 1954, §2, 68 Stat. 769 (same); Act of Aug. 18, 1958, §10(b), 72 Stat. 621 (same); Act of Sept. 5, 1962, §10, 76 Stat. 431 (same); Act of Apr. 12, 1968, Pub. L. 90–287, §2, 82 Stat. 93 ("Nothing in this Act shall make such tribe or its members eligible for any services performed by the United States for Indians because of their status as Indians"); Menominee Restoration Act, Pub. L. 93–197, 87 Stat. 770 (An Act "to reinstitute the Menominee Indian Tribe of Wisconsin as a federally recognized sovereign Indian tribe; and to restore to the Menominee Tribe of Wisconsin those Federal services furnished to American Indians because of their status as American Indians"). This sort of language also appeared in recognition statutes in the years immediately following ISDA. *E.g.,* Indian Tribal Restoration Act, §4, 92 Stat. 247 (Tribes and their members "shall be entitled to participate in the programs and services provided by the United States to Indians because of their status as Indians"); Siletz Indian Tribe Restoration Act, §3(a), 91 Stat. 1415 (reinstating eligibility for "all Federal services and benefits furnished to federally recognized Indian tribes"); Paiute Indian Tribe of Utah Restoration Act, §3a, 94 Stat. 317 (same).

Indians.   1 Cohen, Handbook of Federal Indian Law §3.02[3], at 134.

There is more evidence too.   When Congress passed ISDA, it sought to provide Indians "meaningful leadership roles" that are "crucial to the realization of self-government."   25 U. S. C. §5301.  Accordingly, "tribes may enter into 'self-determination contracts' with federal agencies to take control of a variety of federally funded programs." *Menominee Tribe of Wis.* v. *United States*, 577 U. S. 250, 252 (2016); see also §5321.  Handing over federal government programs to tribal governments in order to facilitate self-government is precisely the sort of government-to-government activity that aligns with formal recognition.  See also §§5384, 5385 (reflecting later amendments to ISDA) (instructing the Secretary to enter compacts and funding agreements "with each Indian tribe participating in self-governance in a manner consistent with the Federal Government's trust responsibility, treaty obligations, and the government-to-government relationship between Indian tribes and the United States").

The CARES Act itself offers still further clues.   In the provision at issue before us, Congress appropriated money "for making payments to States, Tribal governments, and units of local government."   42 U. S. C. §801(a)(1).  Including tribal governments side-by-side with States and local governments reinforces the conclusion that Congress was speaking of government entities capable of having a government-to-government relationship with the United States.  Recall, as well, that the CARES Act defines tribal governments as the "recognized governing body of an Indian Tribe." §801(g)(5).  ANCs, like most corporations, have a board of directors, 43 U. S. C. §1606(f), and a corporate board may well be the governing body of an enterprise.  But they do not govern any people or direct any government.

B

While initially acknowledging that the recognition clause applies to ANCs, the Court interprets its terms differently. Rather than understanding it as denoting a government-to-government relationship, the Court says, we should look to its "plain meaning." *Ante*, at 7. But even if we could somehow set aside everything we know about how the term is used in Indian law and the CARES Act itself, it's far from clear what "plain meaning" the Court alludes to or how ANCs might fall within it.

First, consider the Federally Recognized Indian Tribe List Act of 1994 (List Act). The List Act instructs the Secretary of the Interior to keep a list of all federally recognized Indian tribes. It does so using language materially identical to that found in ISDA's recognition clause: "The Secretary shall publish in the Federal Register a list of all Indian tribes which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U. S. C. §5131(a). No one before us thinks the Secretary of the Interior should list the ANCs as federally recognized tribes. And given that, it is unclear how ANCs might count as federally recognized tribes under ISDA. To be sure, the List Act came after ISDA. But the Court never attempts to explain how the plain meaning of nearly identical language in remarkably similar legal contexts might nevertheless differ.

Second, on any account, ISDA requires an Indian tribe or group to be "recognized." But what work does this term do on the Court's interpretation? Without explanation, the Court asserts that ANCs are "'recognized as eligible' for ANCSA's benefits" because they are "'established pursuant to' ANCSA." *Ante,* at 8. But on this understanding, any group eligible for benefits would seem, on that basis alone, to be "recognized" as eligible for those benefits. The Court's

reading comes perilously close to rendering the term "recognized" surplusage: If ISDA really does capture any group merely "eligible" for federal benefits, why not just say *that* and avoid introducing a term with a particular and well-established meaning in federal Indian law?

Third, even putting aside the recognition requirement, ISDA says tribes must receive services from the United States "because of their status as Indians." §5304(e). The Court says that ANSCA made ANCs eligible for settlement funds and lands because its shareholders are Alaska Natives. *Ante*, at 8. But is compensation provided to profit-maximizing corporations whose shareholders happen to be Alaska Natives (at least initially, see 43 U. S. C. §§1606(h)(1), 1629c) a benefit provided to *Indians*? And were ANSCA settlement funds provided to ANCs and their shareholders because of their Indian *status* or simply because Congress wanted to resolve a land dispute regardless of the claimants' status? See §1601(b) ("[T]he settlement should be accomplished . . . without establishing any permanent racially defined institutions, rights, privileges, or obligations . . . "); but see §1626(e)(1) ("For all purposes of Federal law, a Native Corporation shall be considered to be a corporation owned and controlled by Natives . . . "). Again, the answers remain unclear. *Ante,* at 8–9.

Finally, ISDA provides that tribes must be recognized as eligible for "*the* special programs and services provided by the United States." 25 U. S. C. §5304(e) (emphasis added). It is a small word to be sure, but "the" suggests the statute refers to a particular slate of programs and services—here the full panoply of federal Indian benefits—not just *any* special programs and services the government might supply. See *Nielsen* v. *Preap*, 586 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 14) ("[G]rammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context'" (quoting Merriam-Webster's Collegiate Dictionary 1294

(11th ed. 2005))).  It's undisputed too that, while ANSCA provided certain compensation to ANCs, Congress has never made those entities "eligible for the full range of federal services and benefits available to [recognized] Indian tribes."  Brief for Federal Petitioner 48.

Rather than confront this last problem, the Court elides it.  In its opinion "the special programs and services" becomes "federal Indian programs and services," *ante,* at 10, 14.  Nor, even if one were to (re)interpret "the special programs" as "some special programs," is it clear whether ANCSA qualifies.  See *ante,* at 10.  On what account is settling a dispute over land title a "program" or "service"?  See 43 U. S. C. §1626(a) ("The payments and grants authorized under this chapter constitute compensation for the extinguishment of claims to land, and shall not be deemed to substitute for any governmental programs otherwise available to the Native people of Alaska").  Beyond even that, ANCSA extended specific compensation to ANCs—money and title—in exchange for settling land claims.  ANCSA provided ANCs nothing in the way of health, education, economic, and social services of the sort that ISDA allows tribes to contract with the federal government to provide.

The Court's reply creates another anomaly too.  If receiving any federal money really is enough to satisfy the recognition clause, many other Indian groups might now suddenly qualify as tribes under the CARES Act, ISDA, and other federal statutes.  A 2012 GAO study, for example, identified approximately 400 nonfederally recognized tribes in the lower 48 States, of which 26 had recently received direct funding from federal programs.  GAO, Indian Issues: Federal Funding for Non-Federally Recognized Tribes (GAO–12–348, Apr. 2012).  This number does not include additional entities that may have received federal benefits in the form of loans, procurement contracts, tax expenditures, or amounts received by individual members.  *Id.,* at 35.  And still other groups may have federal rights secured

by treaty, which may exist even if the tribe is no longer recognized. Cf. *Menominee Tribe* v. *United States*, 391 U. S. 404, 412–413 (1968). How does the Court solve this problem? With an *ipse dixit*. See *ante,* at 11 ("[T]he Court does not open the door to other Indian groups that have not been federally recognized becoming Indian tribes under ISDA"). The Court's "plain meaning" argument thus becomes transparent for what it is—a bare assertion that the recognition clause carries a different meaning when applied to ANCs than when applied to anyone else.

## III

With its first theory facing so many problems, the Court offers a backup. Now the Court suggests that ANCs qualify as tribes even if they fail to satisfy the recognition clause. *Ante,* at 18. Because ISDA's opening list of entities specifically includes ANCs, the Court reasons, the recognition clause must be read as inapplicable to them alone. Essentially, the Court quietly takes us full circle to the beginning of the case—endorsing an admittedly ungrammatical reading of the statute in order to avoid what it calls the "implausible" result that ANCs might be included in ISDA's first clause only to be excluded by its second. *Ante,* at 20.

But it is difficult to see anything "implausible" about that result. When Congress adopted ANSCA in 1971, it "created over 200 new legal entities that overlapped with existing tribes and tribal nonprofit service organizations." Brief for Professors and Historians as *Amici Curiae* 27. At that time, there was no List Act or statutory criteria for formal recognition. Instead, as the Court of Appeals ably documented, confusion reigned about whether and which Alaskan entities ultimately might be recognized as tribes. 976 F. 3d, at 18; see also Brief for Professors and Historians as *Amici Curiae* 28; Cohen, Handbook of Federal Indian Law 270–271 (1941). When Congress adopted ISDA just four years later, it sought to account for this uncertainty. The statute

listed three kinds of Alaskan entities: Alaska Native Villages, Village Corporations, and Regional Corporations. And the law did "meaningful work by extending ISDA's definition of Indian tribes" to whichever among them "ultimately were recognized." 976 F. 3d, at 26. It is perfectly plausible to think Congress chose to account for uncertainty in this way; Congress often adopts statutes whose application depends on future contingencies. *E.g., Gundy* v. *United States*, 588 U. S. \_\_\_, \_\_\_–\_\_\_ (2019) (GORSUCH, J., dissenting) (slip op., at 11–12) (citing examples).

Further aspects of Alaskan history confirm this understanding. Over time, the vast majority of Alaska Native Villages went on to seek—and win—formal federal recognition as Indian tribes. See 86 Fed. Reg. 7557–7558 (2021); Brief for Respondent Confederated Tribes of Chehalis Reservation et al. 23. (It's this recognition which makes *them* indisputably eligible for CARES Act relief. See *supra*, at 2.) By the time it enacted ISDA, too, Congress had already authorized certain Alaska Native groups to organize based on "a common bond of occupation, or association, or residence." 25 U. S. C. §5119. This standard, which did not require previous recognition as "bands or tribes," was unique to Alaska. See *ibid.* And at least one such entity—the Hydaburg Cooperative Association, organized around the fish industry—*also* went on to receive federal tribal recognition in the 1990s. 86 Fed. Reg. 7558; see also Brief for Respondent Confederated Tribes of Chehalis Reservation et al. 35–36. Though short lived and not a full government-to-government political recognition, the Secretary of the Interior at one point even listed ANCs as "'Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs,'" before eventually removing them. *Ante,* at 15–16. And in 1996, Congress considered a bill that would have "deemed" a particular ANC—the Cook Inlet Region, Inc.—"an Indian tribal entity for the purpose of federal programs for which

Indians are eligible because of their status as Indians" and required that it be included on "any list that designates federally recognized Indian tribes." H. R. 3662, 104th Cong., 2d Sess., §121. Of course, the ANCs before us currently are *not* recognized as tribes. But all this history illustrates why it is hardly implausible to suppose that a rational Congress in 1975 might have wished to account for the possibility that some of the Alaskan entities listed in ISDA might go on to win recognition.

The particular statutory structure Congress employed in ISDA was perfectly ordinary too. Often Congress begins by listing a broad universe of potentially affected parties followed by limiting principles. Take this example from the CARES Act. Congress afforded benefits to certain "'unit[s] of local government,'" and defined that term to mean "a county, municipality, town, township, village, parish, borough, or other unit of general government below the State level with a population that exceeds 500,000." 42 U. S. C. §801(g)(2). The litigants tell us no parish in the country today has a population exceeding half a million. See Brief for Respondent Ute Tribe 31. Suppose they're right. Is that any basis for throwing out the population limitation and suddenly including all parishes? Of course not. Once more, an opening list provides the full field of entities that may be eligible for relief and the concluding clause does the more precise work of winnowing it down. The clauses work in harmony, not at cross-purposes.[2]

———————

[2] To support its implausibility argument, the Court proposes a hypothetical advertisement for "'50% off any meat, vegetable, or seafood dish, including ceviche, which is cooked.'" *Ante*, at 20. The Court posits that any reasonable customer would expect a discount even on uncooked ceviche. It's a colorful example, but one far afield from Indian law and the technical statutory definitions before us. Even taken on its own terms, too, the example is a bit underdone. A reasonable customer might notice some tension in the advertisement, but there are many plausible takeaways. Maybe the restaurant uses heat to cook its ceviche—many chefs "lightly poach lobster, shrimp, octopus or mussels before using

In defense of its implausibility argument, the Court submits any other reading would yield a redundancy. Unless ANCs are exempt from the recognition clause, the Court suggests, Congress had no reason to mention them in the statute's opening clause because they already "fit into one of the pre-existing ISDA categories," like "'tribe[s], band[s], nation[s], or other organized group[s] or communit[ies],'" *ante,* at 20–21 (quoting 25 U. S. C §5304(e)).

But this much is hard to see too. Admittedly, illustrative examples of more general terms are in some sense always redundant. See *Chickasaw Nation* v. *United States*, 534 U. S. 84, 89 (2001) ("[That] is meant simply to be illustrative, hence redundant"). But Congress often uses illustrative examples in its statutory work, and the practice is not entirely pointless. As this Court has explained, illustrative examples can help orient affected parties and courts to Congress's thinking, and often they serve to "remove any doubt" about whether a particular listed entity is captured within broader definitional terms. *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 226 (2008); see also *Federal Land Bank of St. Paul* v. *Bismarck Lumber Co.*, 314 U. S. 95, 99–100 (1941); A. Scalia & B. Garner, Reading Law 176–177 (2012). That much is certainly true here. If Congress had failed to list ANCs in ISDA's first clause, a dispute could have arisen over whether these corporate entities even qualify as "Indian . . . organized group[s] or communit[ies]." See Brief for Petitioners in No. 20–544, p. 5; *supra,* at 9 (citing 43 U. S. C. §1601(b)).

———————

them in ceviche." See Cordle, No-Cook Dishes, St. Louis Post-Dispatch, July 17, 2013, p. L4. Maybe the restaurant meant to speak of ceviche as "cooked" in the sense of "fish . . . 'cooked' by marinating it in an acidic dressing" like lime juice. See Bittman, Ceviche Without Fear, N. Y. Times, Aug. 14, 2002, p. F3. Or maybe the restaurant simply listed every dish it makes, understanding some dishes would be excluded by the concluding "cooked" proviso. Even in the Court's own hypothetical it is not "implausible" to apply the modifier across the board.

Having said all this, my disagreement with the Court's "implausibility" argument is a relatively modest one. We agree that linguistic and historical context may provide useful interpretive guidance, and no one today seeks to suggest that judges may sanitize statutes in service of their own sensibilities about the rational and harmonious.[3]  Instead, our disagreement is simply about applying the plain meaning, grammar, context, and canons of construction to the particular statutory terms before us. As I see it, an ordinary reader would understand that the recognition clause applies the same way to all Indian groups. And if that's true, there's just no way to read the text to include ANCs as "Tribal governments" for purposes of the CARES Act.

\*

In my view, neither of the Court's alternative theories for reversal can do the work required of it. The recognition clause denotes the formal recognition between the federal government and a tribal government that triggers eligibility for the full panoply of special benefits given to Indian tribes. Meanwhile, a fair reading of that clause indicates that it applies to ANCs. Accordingly, with respect, I would affirm.

––––––––––

[3] The Court does not suggest, for example, that the reading of the statute it rejects would be "absurd." Absurdity doctrine "does not license courts to improve statutes (or rules) substantively, so that their outcomes accord more closely" with "'what we might think is the preferred result.'" *Jaskolski* v. *Daniels*, 427 F. 3d 456, 461 (CA7 2005) (Easterbrook, J. for the court) (ellipsis omitted). At most, it may serve a linguistic function—capturing circumstances in which a statute's apparent meaning is so "unthinkable" that any reasonable reader would immediately (1) know that it contains a "technical or ministerial" mistake, and (2) understand the correct meaning of the text. See *Lexington Ins. Co.* v. *Precision Drilling Co.*, 830 F. 3d 1219, 1221–1223 (CA10 2016); A. Scalia & B. Garner, Reading Law 237–238 (2012). Anything more would threaten the separation of powers, undermine fair notice, and risk upsetting hard-earned legislative compromises. *Ibid*; see also *Virginia Uranium, Inc.* v. *Warren*, 587 U. S. \_\_\_, \_\_\_–\_\_\_ (2019) (slip op., at 15–16).